## James A. Rice v. John Ruddiman.

Fractional townships, as surveyed by the United States, are *townships* within the meaning of the clause in the State Constitution which provides that organized counties shall not be reduced to "less than sixteen townships as surveyed by the United States," unless the act providing therefor be submitted to and ratified by the people of the counties.*

A law must be understood as beginning to speak at the moment it takes effect, and not before. If passed to take effect at a future day, it must be construed as if passed on that day, and ordered to take immediate effect. Per CHRISTIANCY J., CAMPBELL J. concurring.

The act organizing the county of Muskegon, approved February 4, 1859, not being ordered to take immediate effect, went into operation under the Constitution, May 16, 1849. The act provided for an election of county officers "at the

* See for a more full discussion of some of the questions involved in this case, the case of *Carleton v. The People*, post.

annual township meeting to be held in April next." This must be construed to mean the April next after the law took effect; and in the absence of proof to the contrary, individuals acting as county officers in October, 1860, must be presumed to have been elected in April, 1860, and not in April, 1859. Per CHRISTIANCY J., CAMPBELL J. concurring.

Admissions of parties as to conclusions of law can not bind the Court.

The rule of riparian proprietorship upon the river Detroit, as laid down in *Lorman v. Benson*, 8 *Mich.* 18, is applicable to Lake Muskegon; and the ownership of land bordering upon the lake carries with it the ownership of the land under the shallow water so far out as it is susceptible of beneficial private use, but subordinate to the paramount public right of navigation, and the other public rights incident thereto.

*Heard November 14th and 15th 1861. Decided April 30th.*

Error to Muskegon Circuit.

Rice was prosecuted by Ruddiman, under chapter 150 of the Compiled Laws, for the forcible entry and detainer of a building described as situated on the Muskegon Lake, in Muskegon township, near the north shore of said lake, opposite fractional section sixteen, town ten north of range ten east. Ruddiman pleaded not guilty to the complaint, and judgment having been rendered against him on trial before the Commissioner, appealed to the Circuit Court, where the cause came on for trial October 10, 1860.

After a jury was impanelled, but before it was sworn, defendant's counsel objected to the whole panel, and to the swearing of a jury in the cause, upon the ground that under the statutes of this State there was no such officer as clerk or sheriff of said county of Muskegon, and therefore no lawful jurors; which objection was overruled by the Court.

It appeared in evidence on the trial, that on the tenth day of December, 1859, the plaintiff was in possession of the premises in controversy, and that on that day the defendant, who was Deputy United States Marshal for the District of Michigan, forcibly entered into the same and took possession, by virtue of a writ of possession issued July 20, 1859, by the Circuit Court of the United States for the District of Michigan in Chancery, directed to the Marshal of said district, commanding him to go to and

enter upon fractional section eighteen, in township ten north of range sixteen west, in the county of Ottawa, and eject and remove therefrom said Ruddiman, and all and every person or persons holding or detaining the same or any part thereof against Anson Eldred or his assigns, and that he put said Eldred or his assigns in the full and peaceable possession thereof. This writ was issued in a suit in which said Eldred was complainant and said Ruddiman defendant, commenced May, 1854, to foreclose a mortgage deed, given in 1849, by said Ruddiman, of fractional section eighteen, to secure the payment of money advanced in building a mill on said section, and for other purposes.

A plat was then given in evidence, which was admitted to be a correct sketch of the said fractional section eighteen, with reference to Muskegon Lake, and with reference to the building described in the complaint, which is the one marked " 2 " on the plat.* The surroundings, as shown by the plat, are as they now appear.

---

*Annexed is a reduced copy of this plat.

The following testimony was then given on the part of defendant.

*Robert Jibson* testified, that "the Ruddiman mill stands about twenty - nine rods, as near as I can judge, from the main land, in a direct line out in the water from shore. The present roadway from the mill to the shore was not there in 1849; in that place was then a foot bridge over the water; teams had access to the mill over a sand bar. I don't think the sand bar went all the way to the mill, but say, out as far as the blacksmith shop [marked "3" on the plat]; the rest of the way, I think, was a road of slabs, or a slab bridge, up to the mill; the bar was wider and larger where the blacksmith shop stood than the rest of its length. In 1849 I took up the floor near the machinery, and examined the foundation of the mill at Ruddiman's request; there was a sort of springing motion in the foundation when the mill was in operation, which made it difficult to work the mill; under the floor I found water, and a soft muddy deposit into which I could thrust an edging perpendicularly four or five feet; the water between the mill and the shore is used for a boom; there was but very little dock when I first saw it. I have known the mill ever since it was built; there was a shed standing where the new part of the mill now is; there was a sort of shed there in 1849, but I afterward built another in its place, which remained till it was torn away to make room for the new mill; the water in Muskegon Lake is higher now than it was in 1849, but how much I can not exactly tell; it is falling a little this season.

*Robert H. Morris* testified, that "Lake Muskegon is about six miles long, with an average width of two and a half miles; the outlet from it into Lake Michigan is about sixty rods long, and the level of Lake Muskegon is affected by the level of Lake Michigan, and rises and falls with it." (It was here admitted by both parties that, for the purposes of this trial, Lake Muskegon should be considered an arm or

estuary of Lake Michigan, and part and parcel thereof, and not as a widening or continuation of Muskegon river). "I remember the site of the Ruddiman mill before the mill was built; I was around the north side of Muskegon Lake shortly before the Ruddiman mill was built; I think the same season; I remember the sand bar; it was dry when I was there. It was my impression that this mill, or a part of it, was built on the end of this bar; I do not remember the width of the bar, but think it was two or three rods wide in the widest place; it extended from the shore in an easterly direction. The present level of Muskegon Lake is from one foot to eighteen inches higher than in 1849; there was grass and rushes growing in the lake about the sand bar. Lake Michigan has a sort of ebb and flow once in six or seven year; perhaps longer; last season the water stood about still; this season it is subsiding a little; the rise and fall of these lakes is an ordinary occurrence."

*Robert Urquhart* testified, "I yesterday examined the line of the sand bar as marked on the plat; it was plainly above water next the shore and next the mill dock, and there were two or three little points above the surface between. The deepest point in the bar was fourteen inches; the point nearest the mill, where the sand bar appeared, was at the edge of the slab dock, and about three hundred feet from the mill."

*Darwin Olney*, a witness for complainant, testified, "I know the building described in the complaint; it is the new Ruddiman mill; it was raised in July, 1855; I was there and assisted in building it; I assisted in preparing and clearing away for the foundation, and in laying the foundation; the bed timbers were laid in the water at the time; the water was about two feet deep where the foundation was laid; the new mill is a separate erection, about twenty by sixty feet, and adjoins the old mill on the south side; there was an old shed torn away which covered a part of the ground; the old shed did not cover the whole length

of the new mill; in preparing the foundation the material taken out was mostly slabs."

The evidence being in, the Circuit Judge charged, among other things, as follows:

That as a matter of fact to be determined by the evidence, it was for the jury to find whether said new mill was upon and parcel of fractional section eighteen, or not.

That if the jury shall find that said new mill was erected upon ground above water at high water mark, and that the same was connected with the main land of said fractional lot by a continuous dry ridge or sand bar, that then the law would pronounce said mill upon fractional section eighteen, and subject to the process in the hands of the defendant, and his lawful acts thereunder would be justified.

That if on the contrary the jury should find that said new mill was built in the water of Lake Muskegon, so that its foundations were covered and surrounded by the circulating waters of said lake at the ordinary level of the same, that then the further admission of the parties in the trial that the entire Lake Muskegon was an arm of Lake Michigan, connected with and constituting a part and parcel of the latter lake, became important from the legal principle involved.

That the principle of law determining the right of riparian owners (upon navigable rivers and above tide water) and extending their proprietary rights to the center of the stream, were not necessarily applicable to the large bodies of fresh water and lakes in the interior of the continent.

That as to the ocean and waters of rivers where the tide ebbs and flows, the well settled principles of law determine that the proprietary interest of the riparian owner in the soil terminates at the line of ordinary high water mark: the State in virtue of its sovereignty holds the

RICE v. RUDDIMAN.

ownership between high and low water mark; leaving to the riparian owner the right to abate as a nuisance any erection or use of the waters in front of his premises, incompatible with his free access and use in common with the public.

That with this sovereign right of the State the Federal Government can not interfere, by sale or otherwise, except for purposes of commerce and national defense.

That in the apparent absence of a settled law regulating and defining riparian rights around the large fresh water lakes of this continent, sustaining a commerce rivalling the ocean, the Court can perceive no reason why the doctrine applicable to tide water should not apply to the lakes equally; the quality of the water, whether salt or fresh, being entirely immaterial; and especially if the jury find as a fact that the waters of all these lakes are subject to the same periodical tidal influences with the ocean.

The Court therefore charge the jury, that the riparian owner upon the shores of Lake Michigan has no proprietary interests in the soil covered by the water, to the center line of said lake, but his rights of soil terminate at ordinary high water mark, under any purchase or patent from the general government; and ownership around Muskegon Lake—it being by the admission of defendant parcel of Lake Michigan—must follow the same rule and be held subject to the same limitation, whenever the waters are susceptible of being navigated for any useful purpose, whether shoal or deep.

To this charge the defendant's counsel excepted, and the jury having found a verdict for complainant, the defendant brought error.

*Walker & Russell*, for plaintiff in error:

1. There was no legal organization of Muskegon county. The act organizing it (*Laws* 1859, *p.* 93) did not take effect till May 16, 1859, while the only election of officers

authorized by it was to take place on the first Monday of April preceding.

The act itself was invalid under the Constitution (*Art.* 10, § 2). It contains no provision for its submission to the people. But neither of the old counties from which Muskegon was taken contains sixteen townships of land as surveyed by the United States. Ottawa contains thirteen whole, and four fractional townships; the latter containing one hundred sections only, counting every fractional section as a whole one. Of these facts the Court will take judicial notice. See for a judicial interpretation of a similar provision in the Constitution of Wisconsin, 1 *Wis.* 200.

2. The Court erred in its charge with respect to riparian proprietorship. We claim this point to be settled by *Lorman v. Benson*, 8 *Mich.* 18. That case arose upon the banks of the river Detroit, but no logical distinction can be drawn between the shores of the strait of Detroit, and of lake Muskegon, or Lake Michigan. If the decision we ask was not in accordance with the common law, we would still ask this Court to overrule the decision below, as contrary to immemorial usage and custom, which has in itself made a common law for the north-west. But no such necessity is imposed upon us. The decisions upon cases arising on rivers and harbors adjacent to the lakes, on the Ohio, Mississippi, Milwaukee and other rivers, are all founded on a principle which legitimately and necessarily leads to the decision we ask. No State bordering upon the lakes has ever claimed any rights in the shallow waters except that of navigation, and the injection of an independent proprietorship between the owner of the upland and the navigable waters of the north-west, would lead to practical evils without limit in number or extent.

*G. V. N. Lothrop*, for defendant in error:

The opinion in *Lorman v. Benson*, carefully abstains from any extension of its doctrines to the lakes.

What, then, is the rule of law applicable to this case?

It has been sometimes suggested that the common law could not apply to riparian owners on our lakes, because, there being few or no like bodies of water in England, the common law was entirely silent as to such cases. But this objection fails if we reflect that the common law is not a system of fixed rules, but a code of principles. These principles may be applied, therefore, with suitable modifications, as new cases arise.

At the common law, the title to the soil beneath the tide waters was presumptively in the sovereign; beneath all streams above tide waters, in the riparian proprietors. All tidal waters, whether in bays, inlets, or rivers, were considered navigable in the same sense that the sea itself was, and the soil beneath them was put on the same footing as that beneath the sea. Now, was this distinction arbitrary, or did it depend on an intelligible principle?

It seems to me that this was the plain principle. Tidal waters were presumed to be of such depth and extent that, both in their nature and uses, they were substantially distinct from the adjacent land. But ordinary streams were regarded but as a part of the land itself, and the right of the public in the waters was considered but as *an easement over the land.* Hence, in such streams, the owner of the bank owned the bed also to the thread of the stream.

When, therefore, we find waters which are; 1. Rivers or streams, affording the *filum aquæ*, as the limit of riparian ownership, and 2. So limited in extent and uses as to be fairly incidental to the land; we can readily extend to to them the common law of waters not technically navigable. But, on the other hand, where the waters expand to a lake, where, in extent, uses and character, they may be fairly regarded as maritime, then it seems to me clear that the law of tidal waters is applicable to them.

That this maritime character belongs to the great Lakes

is everywhere admitted. It was recognized by this Court
and by the Supreme Court of the United States in the
case of *Moore v. The American Transportation Company.*
So the navigation laws and the [admiralty jurisdiction
established over the Lakes recognize the same thing.

The character which belongs to the lakes extends to
all their bays, inlets, and arms; for, however named, they
are but parts and divisions of the lakes. It thus seems
clear to me, on principle, that riparian owners on the lakes
have no interest in the soil beneath their waters. I am
not aware of a single judicial decision, or even dictum,
which intimates such ownership. On the other hand, I
find my position supported by considerable authority: —
*Ang. on Water Courses,* § 41–2 ; 9 *N. H.* 461 ; 1 *Shep.*
198 ; 13 *Pick.* 261 ; 1 *Fairf.* 238 ; 30 *Me.* 47 ; *Walk. Ch.*
155 ; 5 *Wend.* 447 ; 17 *Wend.* 597, 616,. 621 ; 19 *Barb.* 484.

CHRISTIANCY J. :

The first error assigned is, that the Court overruled
the objection of the defendant below to the panel of jurors.
This objection was made on the ground that, under the
statutes and the Constitution of the State, there were no
such officers as clerk or sheriff, for the reason that the
county had not been legally and constitutionally organized
at the time of the trial, and that there was no law
authorizing the election of county officers.

The act of February 4th, 1859 (*Sess. L. p.* 94) pur-
ports to organize the county of Muskegon, describing by
townships and ranges the territory of which it is to be
composed, establishes the county site at the village of
Muskegon, authorizes the electors at the election in Novem-
ber, 1860, to elect one member to the House of Repre-
sentatives, and then provides, § 4, that " at the township
election to [be held in April next, the proper county
officers for said county shall be elected, whose terms of
office shall expire on the first day of January, 1861, and
when their successors are elected and qualified."

RICE v. RUDDIMAN.

It is insisted by the plaintiff in error, that the act is in violation of § 2 Art. X of the Constitution, because it leaves less than sixteen full townships of thirty - six sections each in ,each of the organized counties from whose territories it was taken, and no provision is made for submitting the question to the people. It is admitted that the remainder of each of those counties contains more than sixteen townships, if townships which are fractional by the public surveys are to be counted. By the Constitution organized counties are not to be reduced "to less than sixteen townships as surveyed by the United States, unless" &c.

Now, "as surveyed by the United States," each of these fractional townships is treated and described as a separate and independent township, as much as ·those which are not fractional; and in describing lands within them it would not be necessary to describe the township as fractional. We are therefore all of opinion that these fractional townships are to be treated as whole . townships under this provision of the Constitution.

But it is insisted, secondly, that as no particular time was fixed by the act when it should take effect, and it was not passed by a two - thirds vote, it could not go into operation until ninety days after the end of the session, which would bring it to the sixteenth or seventeenth of May, 1859; and that, as the county officers were required to be elected in "April next," it follows, as a consequence, that the election was required to be held before the act could constitutionally take effect; and that the act, so far as it authorized the election, was void.

It is very clear the act did not take effect till ninety days after the end of the session. But we do not think the act was therefore void as to the election provided for. It took effect in May, 1859, and must be understood as beginning to speak at the moment when it became a law, and not before. It must have the same construction

RICE v. RUDDIMAN.

as if passed on the day when it took effect and directed by a two-thirds vote to take immediate effect. "April next" must therefore be understood as April, 1860, being the next April after the act took effect. Any other construction leads to absurdity, and imputes to the Legislature the enactment of a farce under all the solemn forms of legislation.

An election held in April, 1860, would be a full compliance with the law, and, no exception being taken on the ground that it was not so held, we must presume it was then held, and the officers duly elected.

The first error therefore is not well assigned.

The other errors assigned raise the question whether riparian ownership of lands along Muskegon lake is to be governed by the law applicable to tide waters, or substantially by the common law rule applicable to fresh water streams above the ebb and flow of the tide?

The plaintiff below appears to have been the owner of fractional section eighteen, T. 10 N. of R. 16 west, bounded, according to the United States survey of the public lands, by the water line of the lake. The section was made fractional by the waters of the lake occupying a part of what would otherwise have fallen within its lines. He had executed a mortgage of this fractional section, which had been foreclosed in the United States Circuit Court for the District of Michigan. Either about the time of the mortgage or afterwards, and before the foreclosure, he had erected a saw-mill and other buildings in the shallow waters of the lake, about twenty-nine rods from the margin or meandered line of the section, but within the area which, but for the water, would have been within the lines of the section, and at or a little beyond the point where a sand bar, extending from the land, sunk below the water: the depth of the water where the mill was built being about two feet. This sand bar at the time the mill was built furnished the road way to, or very

nearly to, the mill, but in subsequent higher stages of the water was covered, and a road way was made of slabs to the land, and the space around the mill, or what is commonly known as the mill yard, was formed by slabs and refuse ,stuff from the mill. Along the sides of the bar and about the mill the bottom was a soft and muddy deposit, in which grass and rushes grew.

The plaintiff in error (defendant below) justified the taking of possession and the ejecting of the plaintiff below under a writ of possession issued in the foreclosure suit.

The evidence in the case tended to show (and upon this there appears to have been no dispute) that Muskegon lake is about six miles long, with an average width of about two and a half miles; that "the outlet from it into Lake Michigan is about sixty rods long"; and though the evidence is silent as to the width of the "outlet," yet it is evident from this language that the lake itself does not extend ·to Lake Michigan, but that it discharges its waters into the latter through a comparatively narrow passage, called an outlet, and that this is about sixty rods long. But "the level of the lake is affected by the level of Lake Michigan, and rises and falls with it."—It does not appear by the evidence whether a distinct river channel (of Muskegon River, which flows into this lake and through it to Lake Michigan) can be traced through the lake. Such are the facts appearing in the case; and it is difficult to conjecture how any other facts which might be made to appear could alter, the effect of these upon the question whether this lake is to be considered a part of Lake Michigan. And though it was admitted by both parties that, "for the purposes of the trial, Lake Muskegon should be considered an arm or estuary of Lake Michigan, and part and parcel thereof, and not as a widening or continuation ·of Muskegon River," I am inclined to consider this rather as the admission of a conclusion of law from the facts, than as a mere admission of fact.

10 MICH.—J.

Whether this lake is to be considered a part of Lake Michigan, or as a widening of the Muskegon River, so far as it might be material, would be a question of law to be decided upon the facts of the case, and no admission of the parties could bind the Court as to the law. The lake in question might partake of the characteristics of both, and the question would then be which predominates. And upon the assumption that a different rule is to be applied to each—which I do not intend to be understood as admitting—I should be inclined to hold that this lake, so far as its character can have any bearing upon the question of riparian ownership, is to be treated as more properly a widening of the Muskegon River, or a separate lake, than as a part of Lake Michigan. The only circumstance which I have been able to discover tending to give it the character of the latter, is the fact that it rises and falls with it. If this fact were sufficient to make it a part of Lake Michigan, then it is difficult to see why every other stream, large or small, which empties into that lake, should not be considered a part of it so far up as it is affected by the rise and fall of the lake. The rise and fall of Lake Michigan and the other great lakes of the same chain is not a tide occurring at regular intervals, like that of the ocean, nor does it arise from the same cause. And though it is probable their waters may be slightly affected by lunar attraction, and a very minute tide may perhaps be detected by a long and careful course of observation with accurate instruments; yet the Court must judicially notice that it must be too slight to be recognized by ordinary observation, or to serve any practical purpose in determining the extent of riparian ownership. This fact was judicially noticed in *Lorman v. Benson*, 8 *Mich.* 18. Courts must also be presumed to be so far acquainted with the laws of nature, as to enable them judicially to determine that the rise and fall of these lakes is governed mainly by the same causes which affect the rise

RICE v. RUDDIMAN.

and fall of the rivers which flow into them, and which rise and fall more than the lakes themselves; and that all the connecting straits between the lakes, such as the straits of Ste Mary (or Ste Mary's river), the St. Clair and Detroit rivers, must, of necessity, rise and fall with the lakes which they connect. It is a matter of public notoriety that the waters of Detroit River vary in height at different, but irregular periods, to the extent of several feet from this cause, and quite as much as those of Lake Michigan or Muskegon lake are shown to vary. Yet we all held in *Lorman v. Benson* that the common law rule applicable to streams above the ebb and flow of the tide applied to that river, and I have not been able to discover any fact or circumstance in this case sufficient to make a substantial difference in principle between that case and [the present. I am entirely satisfied with the principles established by that case, and think them substantially applicable to the present. Whether the riparian ownership extends to the center of the lake is a question not involved in this case; the only question being whether it extends to the place where the mill is erected, which is in the shallow water of the lake some twenty-nine or thirty rods from the shore, on ground which is susceptible of beneficial private use and enjoyment as land. The real question is whether the ownership of section eighteen bordering upon the lake carries with it the ownership of the *locus in quo*, not whether it extends beyond, or whether its outward limits in the lake can be defined with precise accuracy. But if the water continues so shallow as to render the lands under it susceptible of beneficial private use to the center line of this narrow lake, then I have no hesitation in saying I think the riparian ownership extends to such center line, unless indeed there may be intervening islands which the government have shown an intention to reserve from the grant of the main land, by surveying them as separate tracts, in which case the riparian ownership would extend only to the center line between the island and the main land.

If the water becomes so deep in approaching the center of the lake as to render the lands under it incapable of such private or individual use, the question of ownership, beyond where it is available for such purpose, becomes as barren as the use itself; and is of no practical importance whatever. But to deny all riparian ownership under the shallow waters, because its outward limits in the lake can not, *a priori*, without reference to the facts of the particular case, be defined with a precision which shall settle all other cases, would be [extremely unphilosophical, and contrary to the principles and analogies of the law in other cases. There are many classes of cases, especially where the question is between the rights of individuals and those of the public, in which the precise line can not be drawn by any general rule applicable alike to all cases. But the law does not therefore deny the existence of both public and private rights, nor either of them: and the courts, admitting the existence of both, seek to determine the question between them upon the facts of the particular cases as they arise.

I do not mean to say that the ownership of the tract here in question, or any other tract bordering upon the lake, must necessarily extend into the lake in the direction of the side lines of the tract: this might depend upon the shape of the lake and the relative rights of adjoining owners. But no such question arises here, as will readily appear by reference to the map attached to the record. When the question arises between adjoining owners, it will not be found difficult of decision within the principle of adjudged cases.

But this riparian ownership does not carry with it the right to the exclusive and unrestricted use of the lands ordinarily covered by the water; as in the case of rivers, that use must in all cases be subordinate to the paramount public right of navigation, and such other public rights as may be incident thereto. In other words, all the

private or individual use and enjoyment of which the land is susceptible, subordinate to, and consistent with, the public right, belong to the riparian owner as against any other person seeking to appropriate it to his individual use.

These principles, when applied to Muskegon Lake, can no more interefere with the public right of navigation than when applied to rivers. In both cases the ownership is equally qualified by, and subordinate to, the rights of the public. In fact, navigation is much more likely to be benefited than injured by the application of these principles. Wharves and other similar erections are essential to the interests of navigation; and if the bed of the lake to high or low water mark were vested in the State, no private owner could extend a wharf one foot, from the water line without becoming a trespasser, and incurring the risk of losing his improvements, though navigation might be aided, rather than injured by it; while, by admitting the riparian ownership as above explained, individual enterprise is stimulated to improvement, and the public interest is subserved. The public, through their proper authorities, have always the right to restrain any encroachments which may be injurious to the public right, and to compel the removal of any obstruction or impediment, as well as to punish the offender, to the same extent as if the bed of the lake were vested in the State.

I am not aware that the State or the Federal Government has at any time asserted any right or claim to the beds of the lakes more than to those of the rivers, and I think the same principles of riparian ownership apply equally to both. I speak here of the small lakes *within* the State, because the large lakes on our borders are not involved in the present case—though I am not aware that the State or the United States has ever asserted any claim with respect to the one more than the other, and I must frankly admit that I have not, as yet, seen any sound reason for making a distinction based upon a difference of size between

RICE v. RUDDIMAN.

lakes more than between rivers: — *Jones v. Soulard,* 24 *How.* 40—nor because some may be a state or national boundary, while others are not. But without expressing any opinion upon the large lakes on our borders, I think the general understanding and common usage of the country have as clearly recognized the principles of riparian ownership with reference to the lakes as to the rivers within the State, and that this general understanding and common usage have been constantly acted upon: and that capital and labor to a very great extent have been expended on the faith of them can not admit of a reasonable doubt. To repudiate this common usage at this late day, by creating an arbitrary distinction which has no foundation in the nature of things, and to recognize in the State or the United States a proprietorship in the beds of the hundreds of lakes and natural ponds within her limits, would, in my opinion, be an unwarrantable interference with private property, and do incalculable mischief.

These lakes and ponds are scattered over almost all parts of the State; they impart to the landscape the charm of picturesque scenery; their banks are often selected as favorite sites for residence, and command a high price; these considerations entered into the original purchase from the Government, and every subsequent purchase. Much, and in many cases most, of the value of these locations, and of the residences upon them, consists in the beauty of the prospect which the lakes afford. But if the land under them belongs to the State or the Federal Government, any man may go into the shallow water a few feet from the shore and erect in front of such dwellings, mills, fishing houses, or such other buildings as his profit, convenience, or malice may dictate, and thereby destroy the beauty of the prospect and the value of the property, and the owner has no remedy but as one of the public at large. The Attorney General could not well interpose for the protection of the owner's private interest alone, and the public right would not in general be impaired.

RICE v. RUDDIMAN.

Some of these lakes form no part of a chain of navigable waters, and are not susceptible of public use for purposes of navigation. Some of them are entirely enclosed by the lands of a single owner. If the bed of the lake belong to the State or the United States in one case, I do not see why it does not equally in others wherever it has been meandered by the public survey. Some startling consequences would flow from such a doctrine, which it is unnecessary here to notice.

There is much good sense in the observations of the Supreme Court of Ohio in *Gavit's Adm'rs. v. Chambers*, 3 *Ohio*, 496, and they have met with the very general assent of the Courts, especially in the Western States. And though these observations were applied to a river, they are, I think, equally applicable to the lakes; and if the beds of these lakes are to be treated "as unappropriated territory, a door is opened to incalculable mischiefs. Intruders upon the common waste would fall into endless broils amongst themselves, and involve the owners of adjacent lands in controversies innumerable. Stones, soil, gravel, the right to fish, would all be subjects of individual scramble, necessarily leading to violence and outrage."

I am therefore well satisfied that both public and private interests are best subserved by recognizing the principles of riparian ownership in respect to the lakes, substantially to the same extent as applied to rivers.

The charge of the Court below, applying to Muskegon Lake the law applicable to tide waters, was erroneous. The judgment must therefore be reversed, with costs, and a new trial granted.

MANNING J.:

On the trial it was admitted that Muskegon Lake is "an arm or estuary of Lake Michigan, and part and parcel thereof." The charge was based on this admission, and its correctness must be tested by it.

In *Lorman v. Benson*, 8 *Mich.* 18, the common law rule, that, gives to the owner of land on a river above tide water the bed of the stream to the middle of the river, was held applicable to the Detroit river, which differs from ordinary rivers only in that it connects two lakes— St. Clair and Erie—having its origin in one and terminating in the other.

To apply this rule to our large lakes, it seems to me, would be absurd. To hold, for instance, that a deed of an acre of land, in a square form, bounded on one side by Lake Michigan, conveyed as an incident to the grant a strip of land of the same width extending forty or fifty miles into the lake, with the sole right to the grantee to take fish in the waters covering the same— for the ownership of the bed of a stream carries with it this right, *Hooker v. Cummings*, 20 *Johns.* 90; *Angel on Watercourses*, § 61—would be an anomaly so great that it would only need to be stated to be universally condemned.

It does not follow from this, however, that the owners of land on our lakes have no greater rights in the lakes than the citizens of the State at large. Whether they have or not is the present subject of inquiry. As individuals, as citizens of the State, they have not. But there may be rights connected with the land itself, growing out of location, public policy, or having some other origin, to which they may be entitled, and which are not common to the citizens of the State at large, or to persons owning lands not thus situated.

We have no legislation on the subject: and in the absence of all legislation, the inquiry is, what are the rights of the citizens of the State in our great lakes? They are the rights of navigation and of fishing. These rights are common to all, whether they own land on the lake shore or not. At the same time it must be admitted, that the owners of such lands have greater facilities for

the enjoyment of these rights than others. In this respect they may be likened to a person residing on a highway, while their fellow citizens generally may be likened to a person residing at a distance from such highway, and who has no means of approaching it except over the land of another. Both have equal rights to the use of the highway, when upon it; but the first, by reason of his residence, has a facility for using it that the other has not.

But the similitude fails, or does not hold good, when we attempt to press it farther. The highway spoken of being the work of man, all rights connected with it are artificial, or conventional. They have no existence of themselves. Whereas the lakes are the work of our Creator, and our rights to them as highways and fisheries are natural and not artificial rights, and may therefore be said to be self-existing rights. The same may be said of the facilities for their enjoyment peculiar to the owners of land on the lake shore. These are also natural and not artificial rights, and like all natural rights, cannot justly be taken from them by the State unless necessary for the good of the body politic, to which all natural rights must yield. They are natural rights incident to location, and of kin to the right of the owners of such land to the lake breeze, or to the exuberant fertility of the soil, should it prove to be more luxuriant than the soil back from the lake. No one would for a moment think of taking away either of these rights from the owner of the land. And yet the rights of which we have been speaking are as truly rights as either of these.

If what we have said be correct, a well settled principle of law steps in here to aid the plaintiff in error. It is this: that where the law gives a right it gives with it all minor rights necessary to its enjoyment. Wharves and piers are almost as necessary to navigation as vessels, and ship-yards or places for the construction of vessels are indispensable. May not therefore the owner of the

shore, under this rule, use the adjacent bed of the lake for the construction of ways, for the launching of vessels, or of wharves and piers for vessels to lie at and receive and discharge their cargoes? The right of navigation without such right would be incomplete.

It seems to me on principle as well as reason, that the owner of the shore has a right to use the adjacent bed of the lake for such purposes. Wharves and piers must be constructed by some one, and by whom if not by the owners of the adjacent shore? No one else can construct them unless it should be the State, or some one under its authority. But has the State that right? Can the owner of the shore be cut off from the lake against his consent, without taking from him those natural rights of which we have spoken?

Without deciding this point, the doubt suggested by it may suffice for the custom that has so long prevailed that it may now be considered the settled policy of the State, for the owners of the shore to construct such works and to use the bed of the lake for that purpose. In a government like ours such is undoubtedly the true interest of the State. It stimulates individual enterprise, encroaches on no private right, leaves the public rights of navigation and fishing unimpaired, and turns to a good account what would only be a profitless monopoly in the hands of the State.

Mills and manufactories, unlike wharves and piers, do not add to the conveniences or usefulness of the lakes as highways or thoroughfares; and yet, they seem to me clearly to come within the state policy mentioned. A different policy as to them would depress rather than encourage enterprise, and render that unproductive which otherwise might be made useful. I am therefore of opinion that all such constructions connected and used with the shore, pass as an incident or appurtenance of the shore in a conveyance of the latter.

The other questions in the case will be considered in the case of *Carleton v. The People*, now before us.

CAMPBELL J. :

I concur entirely in the views of my brother Christiancy. I think the riparian proprietor is entitled to all the control of the bed of the water which can be exercised without damage to the public interest. His right is proprietary and absolute. And while I think that the particular place in controversy is no part of Lake Michigan, I do not regard the distinction as at all material. Usage as well as reason extends to the one as well as to the other. Navigation in our day can not do without wharves and similar conveniences for loading and shelter, and instead of being universal nuisances they are in general indispensable aids to it. The inquiries concerning ownership in deep water, far from shore, can never become practical questions, and it can not make any difference how they are settled. But wherever use can be and is made of the bed of the water, in improvements near the shore, in waters not governed by the artificial common law rules of tide water ownership, I think the rules applicable to fresh water rivers are more reasonable and just, and are certainly more conformable to the common understanding and usage. They preserve all valuable public privileges, and interfere with no rights whatever.

MARTIN CH. J. :

Except upon the first error assigned — respecting which my views will be fully expressed in the case of *Carleton v. The People*, now under consideration—I concur fully in the views of my brother Christiancy. I think the rights of riparian proprietors upon our interior lakes—and I regard Muskegon Lake as such, and not as an arm of Lake Michigan, notwithstanding the stipulation in this case (which, although it must be taken for true, I regard as immaterial) —

are the same as those of proprietors upon our navigable streams. They have the right to construct wharves, buildings and other improvements, in front of their lands, so long as the public servitude is not thereby impaired; they are a part of the realty to which they are attached, and pass with it. Certainly, no one can occupy for his individual purposes the water front of such riparian proprietor, and the attempt of any person to do so would be a trespass. When, therefore, Ruddiman erected the structure in controversy in the shallow water of the lake, and upon his water front, it was substantially an erection upon his own land, and its use and ownership were dependent upon his ownership of the land to which it was appurtenant. He made it a part of his real estate as much as though it had been an additional story erected upon a building situated upon the soil not covered with water. It was a part of the land; appurtenant to it, and to be enjoyed with it. This he can not deny; nor can any one question it whose soil or possession was not thereby invaded. As between individuals, a wharf, and the structures upon it, attached to the soil of a riparian proprietor, are as much a part of the real estate as is a building erected upon the land over which the water does not flow, and by the sale of the land they are conveyed. There is no analogy between such title and the right of fishery, and no argument can be drawn from the one to support the other. Each depends upon separate principles of the law.

*Judgment reversed.*