Granger, C. J.
Did the denial of plaintiff’s title oust the jurisdiction of the court? The claim that it did is based upon the theory that the issue so made is only triable by a jury. But equity courts have long exercised the power to decide finally upon the right of adverse claimants to real estate, where- the nature of the controversy properly called for the interference of a chancellor. A bill to establish and enforce a trust gave him jurisdiction to hear and determine its existence and extent, and to enforce it, in a proper case, by compelling a conveyance- by the defendant as trustee, notwithstanding his answer denied the entire title of the plaintiff. In this class of cases, as well as in a number of others, the fact that the decision of a judge, without a jury, might divest one in possession of the whole estate, does not affect the jurisdiction. The principle controlling is well known: where a party cannot have adequate and complete relief at law, he may apply in equity; and the chancellor, taking jurisdiction, retains it so far as may be necessary to furnish relief adequate and complete. A careful consideration of the position and relations of tenants in common of realty will satisfy the mind, that when a cotenant has gone into possession and refuses to recognize the title of the owners of the other undivided shares, an ordinary suit at law will not furnish to them adequate and complete relief. In the Ohio statutory proceeding for partition the court could not exercise chancery or equity powers, and was limited to the mode and extent provided by the statute. There would *95 seem to be good reason for holding that those statutory powers could only be exercised on behalf of parties whose title at law was not disputed. But a civil action seeking equitable partition, together with an account of rents and profits, properly invokes the ordinary chancery powers of the court, and therefore upon the principle hereinbefore named, an answer denying plaintiffs title could not oust the jurisdiction. So it was well held in Perry v. Richardson, 27 Ohio St., 110. And the referee was right in so holding in this case.
Is East Harbor capable of private ownership ? An absolute sovereign, holding both ownership and jurisdiction of land and water, may vest in a private grantee such portions of either, as the grantor may determine. A sovereign whose powers are limited by constitutional provisions may do the like, so far as the grant does not contravene any constitutional provision or limitation. So long as navigable waters are left free to the public, for unembarrassed passages to and fro, we know of no reason why'the United States, or any state, holding ownership and jurisdiction of land and water, may not vest in a private grantee such a body of land, marsh and water as “ East Harbor.” History is full of instances of the exercise of such power by governments, and instances in which the courts have protected such a grantee against intrusion are not rare.
The ocean, with its gulfs and bays, belongs to no nation. Jurisdiction is allowed to such a distance from shore as the protection of that shore requires. This distance was fixed as a marine league at a time when no gun could force a ball farther. But over inland waters the nations in which they lie may hold, both as sovereigns and as proprietors. A proprietor may convey all his rights to a grantee unless forbidden by some law to which he is subject. No one not possessed of some right in the thing granted should be heard in objection. Where the grantor is the government, the thing granted government property held by absolute title, and no use of the thing granted to which the public is entitled is taken away, we see no reason for denying to the grantee *96 ownership of the thing granted. In Lorman v. Benson, 8 Mich., 32, Judge Campbell, speaking of Detroit river, says: “ Applying the principles of the common law to the tideless stream in question, we do not conceive what public interests would be subserved by placing it on the footing of tidewaters, when the rules applying to public fresh water streams provide amply for every common easement. The right of navigation, to which all others are subservient, is in no way injured or abridged by this holding, and the necessities of wharves, and other conveniences, which could not be made available at all in such a stream as this, unless owned by the riparian proprietor (because not accessible except over his grounds), would be an inducement to modify the common law, were it otherwise, rather than change it as it is now. * * * And we have no difficulty in holding that the plaintiff is entitled to every beneficial use of the property in question which can be exercised with a due regard to the common easement. The cutting of ice is the exercise of a valuable privilege, in securing that which has become stationary on the freehold, and we conceive of no reason which would'justify a denial of it.”
In Rice v. Ruddiman, 10 Mich, 139, speaking of lake Muskegon, the court, after stating that the real question is not whether the outward limits of private ownership in the lake can be defined with precision, say, “But if the water continues so shallow as to render the lands under it susceptible of beneficial private use to the centre line of this narrow lake, then I have no hesitation, in saying that I think the riparian ownership extends to such centre line. * * * If the water becomes so deep * * * as to render the lands under it incapable of such individual use, the question of ownership beyond where it is available for such purpose becomes as barren as the use itself, and is of no practical importance whatever.
In Delaplain v. Railway Co., 42 Wis., 225, the court say: “ The question as to the ownership of the soil under the water, is one which each state is. at liberty to determine for itself, in accordance with its views of local law and public *97 policy; and if it chooses to concede the right of the riparian owner to the centre of the stream, it is not for others to raise objections.”
In Barney v. Keokuk, 4 Otto, 338, the court say: “ If they (the states) choose to resign to the riparian proprietor, rights which properly belong to them in their sovereign capacity, it is not for others to raise objections.”
In Gavitt v. Chambers, 3 Ohio, 497, the court said: “It is, we conceive, vitally essential to the public peace, and to individual security, that there should be distinct and acknowledged legal owners for both the land and water of the country. This seems to have been the principle upon which the common law doctrine was originally settled; that where a stream was not subject to the ebb and flow of the tide, it should be deemed the property of the owners of the soil bounding upon its banks. The reason upon which this rule is founded, applies as strongly in this country as in any other. And no maxim of jurisprudence is of more universal application, than that where the reason is the same the law should be the same.”
In the cases referred to, the courts were dealing with implied grants, resulting from bounding the premises granted by a stream, or other water. What they say applies with additional force when the state owning both the water and the land, by express terms includes within its grant the territory covered by the water.
We think it was competent for Connecticut, with the-sanction of the United States, to vest in its private grantee-the ownership of East Harbor, subject to the public rights-of navigation and fishing. Did the state include East Harbor in its grant ?
As already stated it granted 500,000 acres to be bounded on the west by the west line of the “Reserve,” south by latitude 41°, north by “ the shore of Lake Erie,” and to extendi eastward for the quantity. What was “ the shore of Lake-Erie ” referred to in this grant? The same words described the north line of “ section two.” Was the northern edge of' island and dike “ the shore of Lake Erie ? ”
*98 In one sense all of its bays and harbors are parts of the lake. In another sense the name “Lake Erie” embraces only the main water, excluding land-locked bays and harbors. In which sense were the words used as between the state and its grantees ?
The map shows that the island is a continuance of “ the Dike,” following the trend of the lake shore; that it is made an island because the action of the water has opened, or kept open, two narrow passages called “inlets.” A “ traverse ” of the lake shore was made prior to 1808, and its line followed the outer, or lake, side of both dike and island; the field notes styling East Harbor “ the marsh; ” and describing the eastern inlet as “ a good harbor for small boats and is about six rods wide, and deep.”
It does not appear that the state has ever asserted any ownership of the harbor since the grant of 1792. In the first partition its entire surface was certainly computed as part of section two, and aparted to Franklin and Chappell. Their deeds, as well as those of their grantees, assert title to “ the marsh.” Under these facts can there be doubt that the state used the words “ shore of Lake Erie ” in the popular sense ? Her grant was 500,000 acres. In measuring off that quantity, section two was computed as 4120 acres. ■ To now hold that the harbor was not granted is to deprive the grantees of the state of at least 1000 acres. To do so because the public has fished and hunted, ad libitem, on this marsh, or water, seems to us without warrant. As was held in Sloan v. Biemiller, 34 Ohio St., 514, the right of fishing in Lake Erie and its bays is as open to the public as if they were subject to the ebb and flow of the tide. No mere grant of the land covered by such waters destroys this public right. The private grantee of the land cannot do anything that will interfere with the channel, or hamper the passage of water craft through it. But he may, without the limits of the channel, erect fishing houses or such other structures as his means and the depth of water will permit; he may convert shallow portions into cranberry patches; he may fill up other parts and make solid ground. Although *99 such action by him may lessen the water surface available for the fishing boats, the fishermen cannot complain. Such public right to fish always yields to any permanent improvement by the owner of the land on which the water rests.
How much of East Harbor can be advantageously used by its private owners the record does not tell. It is evident that parts of it may be so used. The private ownership subject to these public rights may be of small value. But it is of some value, and those who own it are entitled to have their respective shares set apart.
Jacob Ramsdell entered into possession of the island and of the 25 acres adjoining lot 18, of section three, in 1846, and he and his grantees have since held possession. But he entered under a deed which recited that so much of the premises granted as lay outside of lots 8, 9 and 20, was “ holden in common ” by his grantor with “ Isaac Ambler and others.”
He had full right to so enter. Having so entered, his possession continued referable to that deed; continued to be that of one tenant in common, until by unmistakable acts of which his co-tenants had notice, or of which it was their duty to take notice, he disclaimed to hold as a tenant in common, and asserted ownership of the entire estate. Until 1877, he and those claiming under him were the only owners resident near the premises. He collected some rents; granted some permits; drove off some trespassers; and paid the taxes. All these were acts that as tenant in common in possession he had a right to do; all of them were perfectly consistent with his being only a tenant in common. Until they were informed that he claimed to be sole owner, his co-tenants might well regard his receipt of rents as merely compensation for looking after the property; or as a matter to be settled and adjusted between them. There is no evidence tending to show that, prior to 1877, any co-tenant had any information that their title was disputed by any adverse claim. Ramsdell’s quitclaim of the 25 acres to Lockwood has resulted in enabling Lockwood by lapse of time to hold that tract as against plaintiff, but *100 a court of equity will treat that as so much of Ramsdell’s share already set off to him, and diminish the quantity now to be set apart for his heirs and their grantees.
We see no reason to disturb the findings of fact made by the referee as stated separately from his “findings,” or conclusions of law. Giving to the evidence full faith and credit so far as it is favorable to the defense, we think it establishes the title of the plaintiff, and his right to an equitable partition and account. We sustain the exceptions to so much of the findings and conclusions of law set out in the report of the referee as conflict with our holding. The court, under section 5213 Revised Statutes, has the same powers in reviewing its decision as it has over the judgment of a trial court. Proceeding to render the judgment required by the record, we grant to the plaintiff a decree for such partition and account, and remand the cause to the common pleas for execution.

Judgment accordingly.