LESLIE M. SAUNDERS and Another, Respondents, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Appellant.

*Riparian owner's right of access to the Hudson river — accretions — occupation by a railroad — grant from the State.*

The owner of upland along the navigable waters of the Hudson river has such a title to accretions to his land, in the sense of having the right to unobstructed access to the shore, as entitles him to restrain the occupation of such accretions by a railroad company which has acquired no title thereto nor made compensation·therefor to the owner, and to compel the removal of its tracks therefrom.

A former owner of upland on the east side of the Hudson river, in front of which there was a bay, gave a deed to the Hudson River Railroad Company, for a

strip of land under water seventy-three feet wide across the bay, on which the company constructed its road; the right of the grantor to cross the railroad was recognized in this deed, by a covenant to that effect on the part of the company; thereafter the company filled up the land to the east of the strip conveyed to it and laid tracks thereon, and finally the whole bay, from the original high-water line west to the original railroad embankment, was filled with earth so as to exclude the water.

In an action brought by the present owners of the upland to restrain the use by the railroad company of the land so formed, between the strip covered by its deed and the upland, it appeared that the State had by letters patent granted the land under water west of the railroad line to the plaintiffs' grantors.

*Held*, that the deed to the railroad company could not be deemed to affect the right of the grantor to pass from the original shore over the parcel conveyed thereby without obstruction, at least as far as the east line thereof; especially after the State by letters patent had granted the land west of the railroad to the plaintiffs' grantors.

The defendant, the railroad company, insisted upon its right to the land in question by virtue of the right bestowed upon the Hudson River Railroad Company by chapter 30 of the Laws of 1848, to alter its line and file a new map and acquire the lands within the new location, the filing of such new map and a grant from the Commissioners of the Land Office of the State of New York, in 1873, of land under water on both sides of the original road bed of the Hudson River railroad from New York to Albany.

*Held*, that neither the charter of the company nor the filing of maps conferred any title upon the defendant to the land in question, and that the grant from the Commissioners of the Land Office was ineffectual in so far as it assumed to convey a strip of land under navigable water in front of the shore of the Hudson river without any reservation in favor of the shore owners, and thus to deprive them of their exclusive rights of access to the water.

APPEAL by the defendant, the New York Central and Hudson River Railroad Company, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of Westchester county on the 8th day of April, 1893, upon a decision of the court rendered after a trial by the court at the Westchester Special Term.

The nature of the action, the facts and the questions presented are set forth in the following opinion rendered at the Special Term, and approved by the General Term:

DYKMAN, J.:

The plaintiffs in this action are upland owners on the east bank of the Hudson river at Yonkers.

The Hudson River Railroad Company was incorporated as a body

politic and corporate, by a special law in May, 1846, with power to construct and operate a railroad from New York to Albany.

At that time Ethan Flagg was the owner of the upland now belonging to the plaintiffs, and there was a small bay in front of the land, across which the railroad was projected, and Ethan Flagg gave a deed of conveyance to the railroad company August 13, 1847, for a strip of land seventy-three feet wide and 1,037 feet in length.

The Hudson River Railroad Company constructed its road across the bay upon the land covered by the deed from Ethan Flagg.

Thereafter the Hudson River Railroad Company became consolidated with the New York Central Railroad Company, under the name of the New York Central and Hudson River Railroad Company.

Subsequent to such consolidation the defendant made filling on the east side of the strip included in the Flagg deed, and in 1882 laid down a railroad track east of the original track, and in 1888 laid down another track still further east, and both these tracks extend along the whole front of the plaintiff's upland.

At this time the whole of the bay from the original high-water line west to the original railroad embankment is all filled in with earth so as to exclude the water. Some of that filling was made by the defendant and some by the owner of the upland. The precise quantity of filling done by each is not stated definitely.

Since the two extra tracks were laid down they have been used by the defendant in its business. Its yard is there and large cars are run there and remain upon the tracks for different periods of time.

This action is brought to restrain such use and compel the removal of the two tracks so laid down east of the original road bed of the defendant and in front of the upland of the plaintiffs.

In December, 1873, the defendant obtained from the Commissioners of the Land Office letters patent for a grant of land, under water, on both sides of the original bed of the Hudson River railroad from New York to Albany, containing many thousands of acres of land, and including the land upon which the two tracks above mentioned were laid.

These are the substantial and basal facts upon which the questions involved in this action are to be determined. The questions are

interesting but intricate, and their examination affords a wide scope for research and requires careful discrimination and analyzation.

It will be orderly to determine first the rights of the plaintiffs as riparian or littoral proprietors, and that inquiry can now proceed without embarrassment from the case of *Gould* v. *The Hudson River Railroad Company*, which, after repeated attacks from flank and rear, has now received an assault in front from the Court of Appeals and been overthrown. (*Rumsey* v. *The Railroad Company*, 133 N. Y. 80.) This case can, therefore, be determined in the light of authority upon principles more consonant with reason and justice.

The rights of riparian proprietors, to the water, flow from the contiguity of their land thereto. They have the right of access to the navigable part of the river from the front of their land, the right to make a landing or wharf, subject to the rights of the public, the right of fishing and landing and of accretion. (*Yates* v. *Milwaukee*, 10 Wall. 497.) They may also fill up shallow water in their front and upon such reclaimed land construct wharves so long as they do not infringe upon the rights of navigation. (*Dutton* v. *Strong*, 1 Black, 23.)

Under the civil law they might project a mole in the sea.

These rights and privileges constitute property which is under the protection of the Constitution and the laws, and which cannot be impaired or destroyed without compensation.

In this case the right of accretion is important, because the rule is the same whether the accretion is natural or wrongful, whether it results from natural causes or the work of man. (*Steers* v. *Brooklyn*, 101 N. Y. 56.)

Justice can be done to the littoral owner in no other way. Accretion, whether natural or wrongful, must belong to the upland owner, or he will be excluded from the water and changed into an inland instead of a riparian owner without his assent.

If that rule of law enumerated in the *Steers* case is applicable here, it is difficult to see why the accretion in front of the upland of the plaintiffs did not vest in them and their predecessors in title. If the wrongful construction of a wharf in front of the old shore in that case was viewed as accretion, which went to the riparian proprietor because it was between him and the river, it is difficult to

see why the filling in here should not have the same result, and accrue to the benefit of the upland owners.

In each case the access of the owner is similarly affected, and unless his rights are extended to the new shore he is converted into an inland owner and deprived of the important and valuable rights of a littoral owner without compensation.

In the case of *Ledyard* v. *Ten Eyck* (36 Barb. 126), the defendant owned the land on the east shore of Cazenovia lake, in this State, and the Canal Commissioners excavated the outlet and deposited the material in the shallow water in front of his premises. The defendant took possession of the reclaimed land. The court said the trusteeship of the State, both for the public and the landowner, was at an end, and the land became necessary for the beneficial enjoyment of the upland, and thus arose, if not a legal, at least a strong equitable title which, with the possession, should not be disputed except by the State itself. That case favors the contention of the plaintiffs.

I think the doctrine of the *Steers* case is applicable to this, and that the right of access of the plaintiffs is extended to the new shore formed by the railroad.

I intend to rest my decision on this branch of the case upon the right of the plaintiffs as riparian proprietors, independent of the rights they may have as owners of the land under water west of the railroad.

The defendant contends that the plaintiffs' right of access to the river was terminated or limited by the execution and delivery of the deed from Flagg to the railroad company for the strip of land across the bay, but the deed can have no such operation. At most that deed conveyed that strip of land, and that only, for the use of the road, for the purposes expressed in its charter, and the grantor surrendered none of his rights with which he was clothed as upland owner. (*New York Central & H. R. R. R. Co.* v. *Aldridge*, 135 N. Y. 83.)

Moreover, the grantor reserved to himself and his heirs and assigns all his and their rights to the land below high-water mark except the strip so conveyed, and unlike the reservation which was condemned in the *Blakslee* case, because the right is regarded as appurtenant to the land and cannot exist if severed from the ownership thereof, this reservation was valid because the grantor remained

the owner of the upland and reserved the right as appurtenant thereto.

The case of *Buccleuch* v. *Metropolitan Board of Works* (L. R. [5 H. L.] [Eng. & Irish App.] 418), was this : The Duke of Buccleuch was the owner of land on the bank of the river Thames through which a road was constructed along the shore of the river under an act of Parliament, which cut off his access to the river, and it was decided by the House of Lords that he was entitled to compensation, not only for the land actually taken for the construction of the public road, but also for the permanent damage to the whole property in consequence of its change from riverside to roadside property, including his particular right to use the shore of the river.

That case seems to be a direct authority in favor of the plaintiffs here.

The defense to this action is based upon the right bestowed upon the Hudson River Railroad Company by chapter 30 of the Laws of 1848, to alter its line and file a new map and acquire the land embraced in the new location, the filing of such new map, and the grant from the Commissioners of the Land Office in 1873.

It is to be said of this grant preliminarily that it was for railroad purposes only and the company could take it for no other purpose, and Judge BROWN, in his opinion in the first *Rumsey Case* (114 N. Y. 432), took pains to show how adequate provision was made to give every upland owner easy access to the water and preserve to such owners their access to the river.

There are, however, other reasons why this grant can have no operation which will abridge the rights of riparian owners along the east bank of the Hudson river.

By the common law of England, the title to the soil under navigable waters was in the Crown, and the control over such waters rested in the British Parliament, but by the Revolution and the separation of the States from the Crown the title to the bed of navigable waters which before that rested in the Crown, was transferred to the people of the State by the Revolution, as the successor of their former sovereign.

At the same time the people in their sovereign capacity became vested with the absolute control over rivers which before rested in the British Parliament, but surrendered the power to regulate com-

merce and navigation to the Congress of the United States in 1778 by the adoption of the Federal Constitution.

So that now, through its Legislature, the people may exercise all the power over navigable waters and the soil upon which they lie which could have been exercised by the King in conjunction with Parliament previous to the Revolution, subject to the restrictions imposed by the Constitution of the United States, and no more.

We must now inquire what those powers of the Crown and Parliament were.

It was determined in England at a very early period, that the title to property in the soil under tide waters was vested in the King as the representative of the public for the public use, and after Magna Charta, at least, he never had the authority to make an exclusive grant in an arm of the sea.

It was laid down by Bracton that those things which related particularly to the public good could not be sold, and that rule was based upon principles of public policy. The sea and the navigable rivers are the natural highways of the world, and although the sovereign may make grants of the soil for certain purposes, yet such grants are subject and subordinate to the paramount right of the public, and there is even an implied reservation of such public right in all such grants.

As the people of the State succeeded to the rights of the King and Parliament they took no greater rights.

The distinction is between the " domain of the State," which is the property of which the people have the absolute estate like an individual, and the " public domain," which the State holds as a mere trustee for the use of the public, and " which remains in the state of primitive indivision." (2 Kent's Comm. 339.)

The former applies to things in which the State has an absolute property, and the latter to the property which the State holds as trustee for the public, such as highways and navigable streams.

In the latter case, the State holds only " a regulating power for the purposes of protecting the public in the use of the waters for navigation and other public purposes, and of this power and duty of regulation the State cannot divest itself."

" It is equally true that the riparian proprietors have certain rights and interests which are valuable and of which they cannot be

deprived, except under the exercise of the rights of eminent domain. Among those rights are the rights of access to the navigable river or sea from the front of his lot; the right to make a landing, wharf or pier for his own use or the use of the public, subject to the supervision of the State to see that it does not interfere with navigation; the rights of fishery, of ferry, of towing on the banks, of landing, lading and unlading, the right of accretion, etc." (Report of Hon. Daniel Pratt, Attorney-General, to the Senate, January 28, 1875.)

This quotation is not made because it has the force of authority, but because it expresses in terse language the doctrine which prevails in this State upon that subject.

The same doctrine is laid down by Angell in his learned work on Tide Waters in these words:

" Although the King is regarded as the legitimate proprietor, yet his character in this respect is fictitious, inasmuch as he cannot exercise his ownership to the exclusion, inconvenience or injury of his subjects. He can, therefore, be considered only as guardian and trustee for the benefit of his subjects." (Angell on Tide Waters, 135.)

The same doctrine was laid down by the Supreme Court of the United States in the *Chicago Lake Front* case in the following language: " That the State holds the title to the lands under the navigable waters of Lake Michigan within its limits, in the same manner that the State holds title to soils under tide water, by common law, we have already shown. * * * But it is a title different in character from that which the State holds in lands intended for sale. It is different from the title which the United States holds in the public lands which are open to pre-emption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein, freed from the obstruction or interference of private parties." (*Illinois Cent. R. R. Co.* v. *State of Ill.*, 13 Sup. Ct. Rep. 110; 146 U. S. at p. 452.)

A line of decisions, which commenced with the celebrated *Story* case, holds that an owner of land abutting upon a public street has a property right therein for access, light and air, and that the State has no power to grant a railroad the right to occupy the street when such occupation affects injuriously the enjoyment of such rights, without compensation.

In the opinion of the Court of Appeals in the *Rumsey* case, in the 133 N. Y. Reports, where the *Gould* case was overruled, it was said : " Unless there is some distinction to be made between the rights which pertain to an owner of land upon a public river and one upon a public street which is not perceived, then the principles sanctioned by this court in these cases virtually overrule the *Gould* case, as they are apparently irreconcilable."

So far as those cases relate to the right of access, they are applicable to this case.

We have already seen that, upon the declaration of independence in 1776, the people of each State became sovereign, and in that character became invested with the absolute right to all navigable waters and the soil upon which they rested for their own common use, and such title was held by the State in its sovereign capacity in trust for the public, and continued to be so held and owned in such trust capacity until 1788, when it surrendered the right to control the waters for purposes of commerce and navigation. But it surrendered nothing more. It still remains the owner of the soil and can make grants of the same within the restrictions of the statute, but the extent of the grant in question is almost sufficient of itself to prove that its execution was in contravention of the trust under which the property is held.

The trust is governmental, and the property cannot be alienated except in the execution of the trust in the interest of the beneficiaries. It cannot, with any propriety, be claimed that the surrender of a strip of land containing thousands of acres from New York to Albany to a trading corporation, is in the interests of the public.

The size of a similar grant did not escape the attention of the Supreme Court of the United States in the case of *The Illinois R. R. Co.* v. *Illinois* (*supra*), and in relation thereto it was said in the opinion : " We hold, therefore, that any attempted cession of the ownership and control of the State in and over the submerged lands in Lake Michigan by the act of April 16, 1869, was inoperative to affect, modify or in any respect to control the sovereignty and dominion of the State over the lands or its ownership thereof."

It is not necessary for me to hold this grant void, except so far as

it contravenes the rights of these plaintiffs, and my conclusion is that their rights remain unimpaired.

It must be borne in mind that the right of access is an exclusive right of the riparian proprietor, and the grant in question assumes to convey a strip of land in front of the east shore of the Hudson river without any reservation in favor of shore owners, and thus deprive them of their exclusive rights of access to the water.

My conclusion, therefore, is that the grant in question is unavailing against these plaintiffs and their exclusive right of access to the water, and the obstruction of which they complain must be removed and they must have judgment therefor.

*Frank Loomis* and *Ira A. Place*, for the appellant.

*Ralph E. Prime*, for the respondent.

PRATT, J.:

We think the judgment in this case should be affirmed upon the facts and principles stated in the opinion filed by Mr. Justice DYKMAN upon the trial.

There was no error on the part of the trial judge in refusing to find the third, fifth, sixth and ninth requests of the defendant. Some of said requests were not justified by the evidence and others, if found, could not have changed the result.

The judge found that the title to the land in question was in the plaintiff by virtue of being upland owner, and the same being an accretion to his shore, in this the decision is sustained by authority. (*Steers* v. *Brooklyn*, 101 N. Y. 56.) This case differs from that of *People ex rel. Blakslee* v. *The Commissioners of the Land Office* (135 N. Y. 447), as in that case the relator was not the owner of the adjoining upland.

The plaintiff, at least, had title in the sense that he had the right of unobstructed access to the shore of the Hudson river, which, we think, is sufficient to sustain the judgment. (*Yates* v. *Milwaukee*, 10 Wall. 497; *Rumsey* v. *N. Y. & N. E. R. R. Co.*, 133 N. Y. 79; *Matter of Yonkers*, 117 id. 564; *Illinois Central R. R. Co.* v. *State of Illinois*, 13 Sup. Ct. Rep. 115; *Doane* v. *Broad Street Assn.*, 6 Mass. 332; *Boston & R. Mill Corp.* v. *Newman*, 12 Pick. 467; *Rice* v. *Ruddiman*, 10 Mich. 125.)

We think the deed of Flagg to the defendant of the parcel seventy-three feet in width did not cut off the shore owners' right to go to the river. This deed, expressly limited to parcel B (seventy-three feet in width), could not be held to affect the right of the grantor to pass from the original shore over parcel F in question without obstructions, at least as far as the east line of parcel B, but we think the right also remained in Flagg and his grantees to cross the railroad — parcel B — and go to the river, especially after the State patented the land west of the railroad line (parcel B) to the plaintiff's grantors in 1869. (*Langdon* v. *Mayor*, 93 N. Y. 151; *Smith* v. *N. Y. & O. M. R. R. Co.*, 63 id. 58, and cases cited; chap. 140, Laws of 1850, §§ 44 and 49.)

The right to cross the railroad is recognized in the deed of Flagg to the defendant by a covenant on the part of the latter to that effect.

The defendant utterly failed to show any title to the parcel in question, or any right to occupy the same. Neither the charter nor the filing of maps could confer any title upon the defendants. (*N. Y. Central & H. R. R. R. Co.* v. *Aldridge*, 135 N. Y. 83, 89.)

The power of the Commissioners of the Land Office and the quality of the title of the State to lands under water are sufficiently discussed in the opinion below before referred to. The defense of title by adverse possession was not established as matter of fact, so also of the defense that the plaintiff's deeds of the land were void because of the statute avoiding deeds of land in the actual possession of other persons claiming adversely.

We also think the court below was right in refusing to find defendant's request No. 14, as the proof was against such a conclusion.

There are many questions in this case upon both sides of which much can be said, but in view of the long opinion rendered below, and the discussion of recent cases in the Court of Appeals of a similar character, it seems unnecessary to state more here than the conclusions at which we have arrived after a careful examination of the case and the briefs.

The conclusions of fact seem to be supported by the evidence and the conclusions of law are well supported by reason and authority.

The judgment should be affirmed, with costs.

BARNARD, P. J., concurred; DYKMAN, J., not sitting.

Judgment affirmed, with costs.