# CARR *v.* WASHINGTON & OLD DOMINION RAILWAY.

STATUTES; INTOXICATING LIQUORS; EQUITY; INJUNCTION; NUISANCE; ADEQUATE REMEDY AT LAW.

1. As in the construction of wills, so in the construction of statutes, the paramount rule is to give effect to the intention of the maker, if it does not run counter, in the case of a will, to some positive rule of law, or, in the case of a statute, to some constitutional inhibition.

2. In a statute made on one date to take effect on a later date, words of description in the present tense may be held to relate to the time of the passage, instead of the time fixed for the act to take effect, when such is the manifest intent of the legislature, and especially when a contrary construction would make possible a complete or partial nullification of the act.

3. Where a statute, which by its terms goes into effect on a date subsequent to the date of its passage, prohibits the granting of licenses to sell intoxicating liquor west of the westerly limits of the fire limits of the city, "as now established," and the municipal authorities after the passage of the act, but before the date of its going into effect, change the fire limits, and thereafter the license is granted to a dealer whose place of business is west of the westerly line of the fire limits as it existed at the time of the passage of the act, but not west of the newly established line, the act of the authorities in granting the license is void.

4. A railroad company, which is also a taxpayer, upon a showing that the maintenance of saloons for the sale of intoxicating liquors adjoining its station in a city is without authority of law, and also that the conduct of such saloons constitutes a public nuisance and entails special damage upon the plaintiff, and also constitutes a special menace to it in its business as a carrier of passengers, is entitled to maintain a bill in equity to enjoin the excise board from granting licenses to the proprietors of the saloons.

5. A bill in equity by a taxpayer to enjoin the excise board from granting licenses to saloon-keepers to sell intoxicating liquors, filed before the granting of the licenses, but after the board had formally voted to grant them, will not be dismissed on the ground that the plaintiff had an adequate remedy at law by certiorari, where the plaintiff was not a party to the proceedings before the excise board, and it is at least doubtful whether the remedy by certiorari was open to him.

6. One whose property is being specially injured, and threatened with further special injury, by a nuisance, is not bound to rely upon a prosecution in the criminal courts, even though the nuisance may also partake of a public character and so be the proper subject for criminal prosecution. The fact that an act may be a crime does not prevent it being at a same time a tort, and does not prevent its author from being liable therefor to the injured party.

No. 2894. Submitted February 11, 1916. Decided March 6, 1916.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia, enjoining the Excise Board from granting liquor licenses to its co-defendants.

*Affirmed.*

The facts are stated in the opinion.

*Mr. Leon Tobriner, Mr. Alexander H. Bell,* and *Mr. R. F. Downing,* for the appellants, in their brief cited:

*Bartruff* v. *Remey,* 15 Iowa, 257; *Bates* v. *District of Columbia,* 1 McArth. 433; *Beard* v. *Smith,* 22 Ky. 430; *Bigelow* v. *Hartford Bridge Co.* 14 Conn. 566, 579; *Blanchard* v. *Reyburn,* 32 Leg. Int. 239; *Lake County* v. *Rollins,* 130 U. S. 662, 673, 32 L. ed. 1060, 1065; *Bradshaw* v. *Earnshaw,* 11 App. D. C. 499; *Charles & Blow* v. *Lamberson,* 1 Iowa, 442; *Davenport* v. *D. & St. P. R. Co.* 37 Iowa, 524; *Clark* v. *Insurance Co.* 52 Mo.

272; *Cooper* v. *Hunt,* 103 Mo. App. 16; *Degges* v. *Hitchcock,* 35 App. D. C. 226, 229 U. S. 162, 57 L. ed. 1135; *Dewey Hotel Co.* v. *United States Electric Lighting Co.* 17 App. D. C. 365; *Downing* v. *Ross,* 1 App. D. C. 257; *District of Columbia* v. *Wilson; Elinhirst* v. *Spencer,* 2 McN. & G. 49; Endlich, Interpretation of Statutes, sec. 489, 13 & 14, Vict. chap. 21, sec. 6; *Evansville & C. R. Co.* v. *Barbee,* 59 Ind. 592; *Fox* v. *Patterson,* 43 W. L. R. 277; *Georgetown* v. *Alexandria Canal Co.* 12 Pet. 91, 99; *Gorham* v. *Springfield,* 21 Me. 58; *Harding* v. *People,* 10 Colo. 392; *Holland* v. *Johnson,* 80 Mo. 34; *Hunting* v. *Hartford Street R. Co.* 73 Conn. 179; *Iroquois County* v. *Keady,* 34 Ill. 293; *Kroeger* v. *Wolcott* (Iowa) 76 N. W. 841; *Larribee* v. *Tolbot,* 5 Gill, 426, 30 Md. 308; *Leigh* v. *Westervelt,* 2 Duer, 621; 1 Lewis's Sutherland, Stat. Constr. p. 324, sec. 183; *Leyner* v. *State,* 8 Ind. 492; *Life Ins. Co.* v. *New York,* 4 Duer, 192; *McAuley* v. *Reynolds,* 64 Me. 134; *McLachlen* v. *Gray* (Iowa) 74 N. W. 773; *Northern P. R. Co.* v. *Whalen,* 149 U. S. 157; *Ohio Nat. Bank* v. *Berlin,* 26 App. D. C. 221; *People* v. *Johnson,* 6 Cal. 674; *People* v. *Purdy,* 2 Hill, 35; *Rice* v. *Ruddiman,* 10 Mich. 135; *Robinson* v. *Kilvert,* L. R. 41 Ch. Div. 88; *Rogers* v. *Vass,* 6 Iowa, 408; *Sparhawk* v. *Union Passenger R. Co.* 54 Pa. 420; *State* v. *Bemis,* 45 Neb. 724; *State* v. *Squires,* 26 Iowa, 340, 347; *State ex rel.* v. *Hege,* 37 Mo. App. 338; *State ex rel.* v. *Higgins,* 71 Mo. App. 180; *State ex rel.* v. *Seibert,* 97 Mo. App. 212; *Strickland* v. *Knight,* 47 Fla. 334; *Stauffer* v. *Cinn. etc. R. Co.* 33 Ind. App. 357, 358; *Thorne* v. *Sweeney,* 13 Nev. 417; *United States* v. *Mills,* 11 App. D. C. 503; *United States ex rel. Atty-Gen.* v. *Delaware & H. Co.* 213 U. S. 414; *Walter* v. *Selfe,* 4 De G. & S. 222; *Waugh* v. *Middleton,* 8 Exch. 351, 357; *Wheeler* v. *Chubbuck,* 16 Ill. 361; 3 Bl. Com. 216; 15 Am. & Eng. Enc. Law, 336; 26 Am. & Eng. Enc. Law, 565; 36 Cyc. 1191.

*Mr. Conrad H. Syme,* Corporation Counsel, and *Mr. Francis H. Stephens,* Assistant, for the Excise Board, in their brief cited:

26 Am. & Eng. Enc. Law, 565; 15 Am. & Eng. Enc. Law,

p. 336; *Bartruff* v. *Remey*, 15 Iowa, 257; *Bates* v. *District of Columbia*, 1 McArth. 433; *Beard* v. *Smith*, 22 Ky. 430; *Blanchard* v. *Reyburn*, 32 Leg. Int. 239; *Lake County* v. *Rollins*, 130 U. S. 662, 32 L. ed. 1060; *Bradshaw* v. *Earnshaw*, 11 App. D. C. 489; *Charles & Blow* v. *Lamberson*, 1 Iowa, 442; *Clark* v. *Insurance Co.* 52 Mo. 272; *Cooper* v. *Hunt*, 103 Mo. App. 16; 35 Cyc. 1192; *Davenport* v. *D. & St. P. R. Co.* 37 Iowa, 524; *Degges* v. *Hitchcock*, 35 App. D. C. 266, 229 U. S. 162, 57 L. ed. 1135; *District of Columbia* v. *Wilson*, No. 2860, D. C. Ct. of App. (not yet reported); Endlich, Interpretation of Statutes, sec. 489; *Evansville & C. R. Co.* v. *Barbee*, 59 Ind. 592; *Gorham* v. *Springfield*, 21 Me. 58; *Harding* v. *People*, 10 Colo. 392; *Holland* v. *Johnson*, 80 Mo. 34; *Iroquois County* v. *Keady*, 34 Ill. 293; *Kroeger* v. *Wolcott*, (Iowa) 76 N. W. 841; *Larabee* v. *Tolbot*, 5 Gill, 426, 30 Md. 308; *Leigh* v. *Westervelt*, 2 Duer, 621; 1 Lewis's Sutherland, Stat. Constr. p. 324; *Leyner* v. *State*, 8 Ind. 492; *Life Ins. Co.* v. *New York*, 4 Duer, 192; *McAuley* v. *Reynolds*, 64 Me. 134; *McLachlen* v. *Gray*, (Iowa) 74 N. W. 773; *Northern P. R. Co.* v. *Whelan*, 149 U. S. 157; *Ohio Nat. Bank* v. *Berlin*, 26 App. D. C. 221; *People* v. *Johnson*, 6 Cal. 674; *People* v. *Purdy*, 2 Hill, 35; *Rice* v. *Ruddiman*, 10 Mich. 135; *Rogers* v. *Vass*, 6 Iowa, 408; *Sparhawk* v. *Union Pass. R. Co.* 54 Pa. 420; *State ex rel.* v. *Hege*, 37 Mo. App. 338; *State ex rel.* v. *Higgins*, 71 Mo. App. 180; *State ex rel.* v. *Seibert*, 97 Mo. App. 212; *State* v. *Bemis*, 45 Neb. 724; *State* v. *Squires*, 26 Iowa, 340; *Strickland* v. *Knight*, 47 Fla. 334; *United States* v. *Mills*, 11 App. D. C. 503; *United States ex rel. Atty. Gen.* v. *Delaware & H. Co.* 213 U. S. 414; *Walter* v. *Selfe*, 4 DeG. & S. 222; *Waugh* v. *Middleton*, 8 Exch. 351; *Wheeler* v. *Chubbuck*, 16 Ill. 361.

*Mr. Wilton J. Lambert, Mr. Rudolph H. Yeatman,* and *Mr. Crandal Mackey,* for the appellee, in their brief cited:

*Akers* v. *Marsh*, 19 App. D. C. 43; *Ballenger* v. *United States*, 216 U. S. 240; *Beard* v. *Smith*, 22 Ky. 515; Code, sec. 399; *Chapman* v. *Holmes*, 10 N. J. L. 24; *Cronin* v. *Stoddard*, 97 N. Y. 271; 23 Cyc. pp. 110, 111; 3 Chitty, Pr. pp. 144, 145;

*Cranford* v. *Tyrrett,* 128 N. Y. 341; *District of Columbia* v. *Dempsey,* 1 App. D. C. 67; *Debs Case,* 158 U. S. 594; *Elliott* v. *Cranston,* 10 R. I. 88; *Garfield* v. *United States,* 211 U. S. 249, *Galloway* v. *Stophlet,* 1 Ohio St. 434; *George* v. *Travis,* 157 N. W. 207; *Re Nabb,* 175 Fed. 513; *Johnson* v. *Railroad,* 1 App. D. C. 500; *Kingsley* v. *Gould,* 6 N. J. L. 196; *Kissell* v. *Lewis,* 156 Ind. 244; *Lewis* v. *Bishop,* 19 Wash. 316; 1 Madd. Ch. pp. 12, 181; *McKenzie* v. *Fisher,* 40 App. D. C. 79; *Nutt* v. *United States,* 26 Ct. Cl. 16; *Noble* v. *Union River Logging Co.* 147 U. S. 172; *People* v. *Morgan,* 65 Barb. 473, 479; *People* v. *Mottinger,* 215 Ill. 261; *Reg.* v. *Vincent,* 9 Car. & P. 275; *State* v. *Smith,* 72 Ind. 550; *State ex rel. Hindley* v. *Superior Ct.* 70 Wash. 360; *State* v. *Bossa,* 69 Conn. 340; *State* v. *Moore,* 14 N. H. 451; *Stewart* v. *Hall,* 2 Overt. 182; *Shroyer* v. *Campbell,* 31 Ind. App. 86; *Tillamook City* v. *County,* 56 Or. 113; *United States* v. *Angell,* 11 Fed. 34; *Weeks* v. *Heurich,* 40 App. D. C. 47.

Mr. Justice STAFFORD of the Supreme Court of the District of Columbia, who sat with the court in the hearing and determination of the appeal in the place of Mr. Chief Justice SHEP-ARD, delivered the opinion of the Court:

This was a bill in equity brought by the plaintiff company, the Washington & Old Dominion Railway, against the members of the excise board of the District of Columbia, to secure an injunction restraining the defendants from granting a license to Patrick F. Carr and James W. Wardell to conduct barrooms on their respective premises. Carr and Wardell have been admitted as intervening defendants. A temporary injunction was granted, and the case was heard on bill, answer, and testimony in open court, as well as upon a motion on behalf of the excise board to dismiss the bill; whereupon the motion was overruled and the board was restrained according to the prayer of the bill. From this decree all the defendants have appealed.

The bill proceeds upon the theory that the places which were about to be licensed were in territory where the law forbade licenses to be granted, and that the existence of the barrooms

at those places would constitute a nuisance of a public character, and one entailing special and peculiar injury upon the plaintiff. Both contentions are controverted by the defendants.

1. The solution of the first question depends upon the construction to be given to an act of Congress approved March 4, 1913, and particularly that part of section 9, paragraph 2, which reads as follows: "No saloon, barroom, or wholesale liquor business shall be licensed, maintained, or allowed in the territory west of the following lines: The westerly line of the fire limits as now established from its southerly limits to where the same intersects with the mile limit of the Soldiers' Home; thence westerly and northerly along the said mile limit until the same intersects with Kansas avenue; thence along Kansas avenue to its intersection with the northern boundary of the District of Columbia." [37 Stat. at L. 998, chap. 150.]

Paragraph 25 of the same section reads as follows: "This section shall be in full force and effect from and after July 1st, 1913."

When the act was approved, March 4, 1913, the fire limits referred to extended only to Thirty-fifth street, Northwest, and the barrooms in question are located west of said fire limits; but soon after the act was approved proceedings were instituted to have the fire limits extended to a point west of Thirty-sixth street, Northwest, which would include the said barrooms, and the limits were so extended by an order of the commissioners of the District of Columbia before the 1st day of July, 1913.

Thus it will be seen that the question is whether Congress understood that it was exactly defining a geographical territory with reference to the situation existing at the time when the act was approved, or whether it was adopting, as one of the boundaries, a line the location of which it did not know. It must be assumed that Congress knew the location of the existing fire limits, and also that they knew that during the nearly four months which would elapse between the approval of the act and the date set for the act to go into effect the fire limits might be changed. Did Congress intend that the fire limits and the liquor limits should be and continue to be coincident? If they

did, why should they have fixed the western boundary for license purposes at the fire limits "as now established?" If Congress thought that the license limits ought to follow and coincide with the fire limits, it is reasonable to suppose that they would have omitted the words, "as now established." It is evident that Congress did not intend that the license limits should be extended by an extension of the fire limits. And yet if the defendants' contention is correct, that left a period of four months within which the license limits might be extended by the mere extension of the fire limits. It cannot be argued that there is any such connection between the proper location of fire limits and the proper location of license limits that the location of one ought to determine the location of the other; for certainly Congress rejected that view when it used the words, "as now established." We cannot escape the conviction that Congress, when it passed the act, understood that it was drawing a geographical line, fixed, certain, and definite, and used the expression "the westerly line of the fire limits as now established from its southerly limits to where the same intersects with the mile limit of the Soldiers' Home," exactly as it used the other words in the same sentence, "thence westerly and along the said mile limit until the same intersects with Kansas avenue," and the words, "thence along Kansas avenue to its intersection with the northern boundary of the District of Columbia." If they did not intend thereby to draw a perfectly definite line they drew no line at all upon that side of the license territory, but left the line to be determined at the will of the commissioners and even to be extended to the outer bounds of the District. Moreover, Congress must have understood that the reasons that might impel the commissioners to extend the fire limits during the four months in question were not reasons which would induce Congress to change the license limits.

Counsel for the excise board stated that authorities are numerous to the following proposition; namely, "until the time arrives when an act of the legislature is to take effect and be enforced, it has no force whatever for any purpose, and all acts purporting to have been done under it prior to that time are

void." Citing 35 Cyc. 1191. But the question we are considering is one of description, not of operation. Of course the act did not take effect until July 1, 1913; but when it did take effect did the words, "as now established," relate to the date of approval or the date when the act was to take effect? We will discuss briefly the cases relied upon by the defendants.

*McAuley* v. *Reynolds,* 64 Me. 136, was an action against a town to recover damages sustained by the plaintiff through a defect in a highway. A statute had been enacted declaring that no such action should be maintained unless notice of the injury had been given within sixty days from the time the injury was sustained, providing, however, that the act should not apply to injuries "already sustained." The plaintiff's injury had been sustained after the act was approved and before it took effect. Of course it had not been "already sustained" when the act was approved, but it *had* been "already sustained" when the act came into operation; and so it was held that the plaintiff was not bound to give the notice. To have held otherwise would have been to hold that the act went into operation before the date fixed by the act itself for its operation to begin, and to have required the plaintiff to *do an act* under its provisions before the provisions had become law. We do not see how the court could have held otherwise than it did. The case is a perfect example of the rule that an act does not begin to operate until the time fixed for that purpose by the act itself, or by a general law, or constitutional provision, applicable to all acts. But in the case before us the construction we give the act does not make it *begin to operate* before the time fixed; it only reads certain words of *description,* applying to a geographical territory, in the sense in which the legislature must have used them.

*Leyner* v. *State,* 8 Ind. 492, is a similar case, in principle. A liquor law fixed a date for its operation to begin, repealing inconsistent acts but saving all pending actions thereunder. Of course the repealing clause and the saving clause related to the same date, and that was the date fixed for the act to take effect. If it had been held that they took effect from the date of ap-

proval, there would have been an interregnum between the date of approval and the date when the act was to take effect.

*Rogers* v. *Vass*, 6 Iowa, 408, involved the right of a settler on swamp lands. A statute was passed taking away the right of pre-emption but saving the rights of "actual settlers on the land at the time of the passage of the act." The Constitution of the state required that all laws should be published before they took effect. Between the date of the passage of the act and the date when it was to take effect the petitioner began his improvements. To have held that the petitioner's rights as a settler were cut off by the statute would have been to have made the act operate before the time fixed for its operation to begin, and before the Constitution permitted it to begin. This the court properly refused to do, giving the act a construction that made it constitutional and saved the petitioner's vested rights.

*Davenport* v. *Davenport & St. P. R. Co.* 37 Iowa, 624, held that a statute making certain orders appealable did not operate to make appealable an order passed by the court before the date fixed for the statute to take effect. The court says that statutes are not to be given a retrospective operation unless that construction is absolutely required by the language of the act, and that when a date other than the date of the passage is set for the act to take effect such words as "heretofore," "hereafter," and "prior to the passage," relate to the time of taking effect, and not to the time of passage; which is undoubtedly true so far as the active operation of the statute is concerned; but it will not do to make the rule so inelastic as to prevent the court from perceiving and declaring the manifest intent of the legislature. Rules of construction should be helps, not hindrances, to a true interpretation. To say that an act speaks as of the time when it takes effect is to sum up the results of many cases like those we have been reviewing. But to say that words in the present tense, even when descriptive of natural objects and boundaries, *must* be read as referring to the time when the act is to take effect, no matter how plain it may be that the legislature used them as referring to an earlier date, is to change a helpful rule of construction into a positive rule of law which must be

obeyed to the very letter. This would be nothing less than for the court to make shackles for its own limbs.

In *Iroquois County* v. *Keady,* 34 Ill. 293, an act was passed directing a certain election to be held on a given date. When that date arrived the legislature had not concluded its session, and the Constitution required that no act should take effect until sixty days after the end of the session. Naturally it was decided that an election held on the date fixed was illegal. To the same effect are *People ex rel. McDougal* v. *Johnson,* 6 Cal. 674, and *Rice* v. *Ruddiman,* 10 Mich. 135.

We are cited to 26 Am. & Eng. Enc. Law, 565, as stating that the fixing of a time for an act to take effect "is equivalent to a legislative declaration that the statute shall have no effect until the designated day." *Of course* it has no effect until the designated day, but when the designated day arrives, and the act is to be put into operation, how are its words to be read and understood? That is the question. We are dealing not with words of operation, but words of description,—words relating to a boundary, a boundary "as now established." If "now" refers to the date when the act was to take effect, that boundary was left for another body to establish, and to establish upon grounds and reasons foreign to the purposes with respect to which the legislature was establishing it; and the boundary might be so established (and properly established for the purposes which the other body would have in mind) as utterly to defeat the will and purpose of the legislature. Whereas, if we read "now" as referring to the date of approval, we find the legislature recognizing and making permanent a well-known boundary, and insuring the fulfilment of its own purposes. If the act had read "as established on the 1st day of January, 1913," it would have tied the boundary fast notwithstanding the reference was to a date earlier than the date when the act took effect. So, if it is plain that the word "now" refers to any *other* date earlier than the date fixed for the act to take effect, there is no rule of law that forbids us to recognize that fact.

. The other cases cited by counsel for defendants are of like character with those already considered. They relate to the

active operation of the statute, and not to words descriptive of natural objects, boundaries, or situations. That the rule invoked by defendants is only a helpful rule of construction, and not an absolute rule of law, is shown by the passages quoted in their brief from the recognized authors. Thus, from Lewis's Sutherland's Statutory Construction, vol. 1, p. 324, sec. 183: "The words 'heretofore' and 'hereafter' in an act are construed as having reference to the date of taking effect, and not to the date of passage, *unless the act itself plainly shows a contrary intent.* The supreme court of Texas says: 'We apprehend that no *universal* rule of construction can be adopted when a statute which makes a distinction between future and past transactions is passed upon one day to take effect upon another, but we think the *general rule* is that a statute speaks from the time it becomes a law.'"

So, in 15 Am. & Eng. Enc. Law, 2d ed. 336: "In statutes and constitutions the words 'hereafter' and 'heretofore' *usually* relate to the time when an enactment takes effect, and not to the time of its passage."

We are somewhat surprised by the argument advanced by the defendants' counsel that there was such a natural and logical relation between fire limits and license limits that Congress might well adopt the former for the latter, in view of the fact that Congress used the fire limits only as one portion of the license territory, and expressly tied the fire limits which they did adopt to the limits "as now established." If Congress had entertained the view advocated by counsel for the defendants, it would naturally have left the license boundary to be moved as the fire boundary was moved.

We have referred to a distinction between words of operation and words of description. The same distinction, as applied to the present statute, may be expressed in another way. We are concerned here not with the time when the act begins to operate, but the place where it is to operate. In all the cases cited by the defendants the question was when the act took effect, or when certain things were to be done. In the case before us the ques-

tion is *where* the act is to operate, and what place the legislature had in mind when it attempted to define a territory.

The distinction between words of operation and words of description is illustrated by some of the cases cited upon the plaintiff's brief. For example, *Eliot* v. *Cranston,* 10 R. I. 88. There an act passed on March 31, to take effect on July 1, prohibited imprisonment for debt in cases "where the cause of action accrued after the passage of the act." Eliot was arrested August 11, in an action founded upon a note falling due after the passage of the act but before the day when the act was to take effect. So, the act had taken effect when the arrest was made, and yet if "the passage" of the act was to be construed to mean July 1, when the act took effect, the cause of action did not arise "after the passage," and the arrest was lawful. It was held that the cause of action did arise after the passage, within the meaning of the legislature, and Eliot was discharged. The case is closely in point, because the court recognized that the act itself did not begin to operate until July 1st, and that if the arrest had been made before July 1st it might have been lawful; but the arrest having been made after July 1st, the description of the causes of action to which it should apply was to be understood as referring to the date of the actual passage of the act.

So, in *People ex rel. School Inspectors* v. *Mottinger,* 215 Ill. 261, 74 N. E. 150, it was held that an act providing that certain money should be raised "as now provided by law" referred to the law already existing, and not to the new law. To the same effect is *State* v. *Bossa,* 69 Conn. 340, 37 Atl. 977.

In *Beard* v. *Smith,* 6 T. B. Mon. 515, the court had under consideration one of the terms in a proposal for a convention to determine whether the district of Kentucky should be erected into a sovereign state. The proposal was that all private rights and interests in lands within the district, derived from the laws of Virginia prior to such separation, should remain valid and secure under the laws of the proposed state, and should be de· termined by the laws "now existing" in Virginia. The compact was thus proposed by the legislature of Virginia in 1789, but

was not adopted by the convention until 1790, and was not adopted by Congress until 1791; and Kentucky did not become a state until June 1, 1792. The question was whether the words, "laws now existing," referred to the date of the proposal or to the date when the compact took effect, and the court held that they referred to the earlier date. Yet the compact could have no effect or operation until the state was admitted, just as the present act could have no effect or operation until July 1, 1913. The words were words of description in the present tense, and were held to mean the laws which the legislature then had in mind, the character of which they knew, not the laws that might afterwards be enacted. Yet there would, in one view, be more reason in saying that the legislature of Virginia intended the laws that might afterwards be enacted by itself, than that Congress meant fire limits which might afterwards be established by another body.

We are referred by counsel for defendants to another clause in the section under consideration where the word *now* occurs, *viz.,* in paragraph 2, where it is declared that "no saloon, barroom, or other place where intoxicating liquor is sold at retail or wholesale, other than hotels and clubs, shall be licensed, allowed, or maintained within 400 feet of any public schoolhouse, or a *now located or established* college or university, or within 400 feet of any *now established* house of religious worship; " and it is argued that *now* established in these clauses must certainly refer to the time when the act is to take effect rather than to the date of the approval, and that by parity of reasoning the words we have been construing should be read in the same way. But a moment's reflection will show that the purpose of the two clauses is different. In the case of the college, university, or house of religious worship, the purpose was to protect those places. If they were not in existence when the act took effect, they would not need protection; and if they should be erected after the act took effect, they would be erected with full knowledge and notice of the law which permitted the granting of licenses within certain territory; whereas in the case of the fire limits, there was nothing about them to be protected; they

were merely a definite geographical line, affording a convenient method of description. It is worthy of notice in this connection that it is made unlawful to license a barroom, etc., within 400 feet of "any public schoolhouse," whether the same was "now established" or should afterwards be established, showing that there was a reason why license limits should be affected by a change in the location of public schoolhouses. There was no reason why license limits should be affected by a change in fire limits.

As in the construction of wills, so in the construction of statutes, the paramount rule is to give effect to the intention of the maker, if it does not run counter, in the case of a will, to some positive rule of law, or, in the case of a statute, to some constitutional inhibition. Applying this rule to the statute before us, we think it does not admit of serious doubt that the legislature intended by the words, "fire limits as now established," the limits as existing at the passage of the act, and not as they might be established at any later time.

Expressing our view of the law in a single sentence, we hold that in an act made on one date, to take effect on a latter date, words of description in the present tense may be held to relate to the time of the passage, instead of the time fixed for the act to take effect, when such is the manifest intent of the legislature, and especially when a contrary construction would make possible a complete or partial nullification of the purpose of the act.

. We have developed our view upon this branch of the case more fully than we should otherwise have done because of .the evident confidence with which the opposite view was advanced by counsel for all the defendants, and especially by the corporation counsel of the District of Columbia, who appeared for the excise board, and upon whose advice the board acted in granting the licenses in question.

II. The second of the questions above stated relates to the right of the plaintiff to maintain the present bill by virtue of special injuries that would be sustained by it if the licenses should be granted. It will be necessary to outline the pleadings,

and then to notice the evidence, the court of equity having found in favor of the plaintiff and having granted the injunction.

The bill alleges that the plaintiff, the Washington & Old Dominion Railway, is a corporation under the laws of Virginia, authorized by act of Congress to do business in the District of Columbia; that it is a property owner and taxpayer in said District, and brings the bill on behalf of such other persons as may be similarly interested; that for some time prior to March 4, 1913, Carr, who has since been admitted as an intervening defendant, had been conducting a saloon at 3605 M street, Northwest, in said District, just west of the northwest corner of 36th and M streets, and Wardell, the other intervening defendant, had been likewise conducting a saloon at 3603 M street, immediately adjoining, and that both had for some years held licenses to conduct said business at their respective places; that for some years the plaintiff has had a station and waiting room at the northwest corner of 36th and M streets, from which it conducted the business of an electric railway, running across M street over the Aqueduct bridge of the Potomac river to places in Virginia, and carrying large numbers of passengers; that its said station adjoins that of the Capital Traction Company, a street railroad of said District, from which it receives many passengers by transfer; that the plaintiff's said station is next door to the barroom in question; that by day and night it is necessary for the traveling public to be at said station and vicinity in order to make use of the plaintiff's trains in going and coming, and in order to reach the steam railroad trains at the Washington Union Station; that it is necessary for the plaintiff to have motormen and conductors skilful, competent, and sober in order to safely and properly operate its cars, and that in the interest of public safety they should be free from temptations to indulge in intoxicating liquor, and that in the interest of orderly conduct on their part and on the part of passengers, and in the interest of the safety of passengers, and especially of women, there should be a removal of sources of temptation to intoxication in the immediate vicinity of said station. The bill quotes paragraph 2 of section 7 of the act of March 4, 1913, above

referred to, alleging that it was the purpose of Congress to prohibit the carrying on of the saloon business west of 35th street, but that Carr and Wardell, realizing that by the passage of said act their saloons were left within the prohibited territory, conceived the idea of avoiding the operation of the act by procuring the Commissioners of the District to extend the fire limits to a point west of their location, and succeeded in so doing on March 20, 1913; that the right of the excise board to grant licenses to Carr and Wardell for said barrooms was challenged before the excise board, upon the ground that the fire limits referred to in said act were the fire limits existing March 4, 1913, and that the plaintiff by mail sent to the excise board a protest against the granting of said licenses, a copy of which is given in the bill; that no reply to said protest was made by said board, and upon inquiring at the office of the board the plaintiff learned the board had determined to grant said licenses; that the granting of the same would be to the great injury of all those having occasion to use the plaintiff's lines, and would menace the lives and safety of such passengers by reason of the temptation thereby offered to its employees; that the territory in Virginia south of Aqueduct bridge being a territory where liquors are not permitted to be sold, many from that section resort to the vicinity of plaintiff's said station to obtain intoxicating liquor, and thereby create objectionable conditions for peaceably inclined passengers on the plaintiff's lines. Upon the filing of this bill a rule to show cause why a restraining order should not be granted was issued to the excise board. Thereupon Carr and Wardell obtained leave to intervene as defendants, and filed affidavits in opposition to the motion. Albert Carry as trustee under a deed of trust of said barroom premises was also admitted as an intervening defendant. Answers to the bill were filed by Carr, Wardell, and Carry; and upon consideration of the bill, rule, and answers the court issued an order restraining the excise board from doing any act to change the *status quo,* but in the meantime, between the issuing of the rule to show cause and the granting of the restraining order, the excise board had issued the license subject to any order the court might make in

this cause, the board having formally voted before the filing of this bill that such licenses should be granted.

The intervening defendants, in their answers, deny that they had any intention of circumventing the operation of the act of Congress, although they admit that they signed a petition for the extension of the fire limits. They also set out circumstances which they think show that the plaintiff is actuated by a desire to obtain their property for railroad purposes by making it impossible for them to obtain licenses, and thereby depreciating the value of their property, and then they deny that the saloons have been or would be conducted in such a way as to constitute a public nuisance or any source of damage or injury to the plaintiff or his patrons. The members of the excise board, in their joint answer, deny that the fire limits were changed by any indirection or circumvention, and detail the proceedings which resulted in the order of extension, and state the proceedings that were had before them with respect to the granting of the licenses to Carr and Wardell, asserting that they, in deciding that such licenses should be granted, acted in good faith and upon the advice of counsel.

The case was heard upon testimony in open court, the substance of which appears in a statement accompanying the bill of exceptions. A motion was made to amend the bill by alleging that the granting of the licenses would result in great and irreparable damage to the plaintiff, and great detriment to its business and financial affairs, because intoxicated persons daily come out of said barrooms in great numbers, and annoy and interfere with the passengers awaiting the arrival or departure of trains, and cause disorder on the trains, and interfere with their management, and subject the plaintiff to constant risk and danger of suits for damages, and that the existence of the barrooms would lessen the safe and profitable enjoyment of its business and franchise, and would constitute a nuisance and detriment and source of special and irreparable damage to the plaintiff in addition to that suffered by the public. The question of allowing the amendment was held under advisement during the taking of testimony, and the amendment was finally allowed.

The principal question arising upon this branch of the case is whether there was sufficient evidence to justify the court below in reaching the conclusion that the existence of the saloons would constitute a nuisance entailing upon the plaintiff special injury, and exposing it to special danger in its business of a common carrier of passengers.    The evidence tended to show that plaintiff's station at 36th and M streets is a large covered concourse; that Wardell's saloon is separated from the plaintiff's ticket office only by a party wall, the entrance to said saloon being less than 24 feet from the plaintiff's ticket window; that Carr's saloon, which adjoins Wardell's is only a few feet farther away; that the plaintiff has rows of benches in its station and porches for the use of passengers, and two waiting rooms, one exclusively for women; that the company operates 52 miles of railway from the District into Virginia in one direction, 15 miles in another direction, and 12 miles in a third direction, maintaining from thirty to thirty-five stations; that the company leases the property at 36th and M streets, and is regularly assessed and pays taxes on its property in the District; that from 5,000 to 6,000 passengers use said terminal each day; that as many as 250 persons are there at one time standing and waiting about the premises; that at times the plaintiff has to let off its passengers at the end of the bridge opposite said saloons; that people come out of these saloons under the influence of liquor, and board the plaintiff's cars or occupy positions about the waiting rooms, and sometimes stagger among the passengers and conduct themselves in a boisterous manner; that drunken men coming from these saloons sometimes run and board the cars at the risk of accident, requiring additional care on the part of the plaintiff's employees, and the employment of special officers; that general complaints have come almost daily to the company from patrons of the road, against the proximity of these saloons and said troubles arising therefrom; that plaintiff has been put to extra expense in employing watchmen about its premises and in providing guards upon its trains; that in some instances persons coming from these saloons have vomited in front of the plaintiff's toilet room, at one time bespattering

the dress of a lady upon the platform; that 1,600 or 1,800 women use said station each day, besides 70 to 100 children on their way to and from school; that people coming from these saloons have been found to be intoxicated after taking the trains, using profane and vulgar language, or lying down in the seats in the presence of ladies and children on the cars; that people come out of these saloons under the influence of liquor, and pull themselves onto the cars as the cars are moving; that men have been seen going into these saloons sober and coming out drunk, and that one drunken man had been seen to come out of one of these saloons and get hurt trying to board a moving car; that people come from the Virginia side, where liquor is not allowed to be sold, to get their jars or buckets filled at these saloons, and, having only two minutes at the terminal between trains, hurry to get upon the cars even when the same are in motion, sometimes breaking the receptacles containing the liquor; that sometimes fights and disturbances occur among intoxicated men going out of the saloons into the crowd waiting about the plaintiff's rooms.

There was certainly enough in such evidence, although contradicted in some respects by the evidence of the defendants, to justify the court in finding both that the saloons, existing as they did without authority of law, constituted a public nuisance, and that such nuisance entailed special damage upon the plaintiff and constituted a special menace to it in its business as a carrier of passengers. It would be difficult to cite a more typical case of nuisance and one inflicting special injury upon the plaintiff, than that which the testimony thus outlined tends to establish. We do not see how such a condition of things in the immediate vicinity of the plaintiff's terminal could fail to injuriously affect the plaintiff's business, and decrease its earning capacity, as well as to involve it in litigation with passengers. Such damages are in their nature irreparable and incapable of exact ascertainment or measurement.

III. Was certiorari the proper remedy?

The bill was sworn to October 29th and filed October 30th. The rule to show cause was issued October 30th and served the

same day. The bill states that the excise board is about to grant licenses to Carr and Wardell. The answer of the board is that already, on October 29th, they had "formally voted to grant" the licenses, but that "the licenses were issued subject to any order the court might make in this cause." This answer is dated November 6th. On October 29th, when the vote to grant the licenses was taken, there was no such thing as "this cause," and the licenses could not have been *granted* subject to a "cause" the first step in which had not been taken. The licenses themselves, however, were not and could not be *issued* by the board. The law provides that the board shall notify the assessor that such and such licenses have been granted, and that the assessor shall then issue them. The licenses, if issued before, could not take effect until November 1st, which was the beginning of the excise year. No evidence was introduced in the court below to show the exact state and steps of the proceeding before the board, but during the argument a discussion occurred among counsel looking to an agreement as to these facts, from which it appears that the board voted to grant the licenses on October 29th, but that the licenses were not issued until November 1st, and were then issued by the assessor "subject to any order of the court that might be made in this cause," whatever that may mean.

The law requires petitions for licenses to be made in writing, and the excise board provides blanks for the purpose. The petition must show the exact location of the place for which the license is desired. A record is required to be kept of all petitions and of the action of the board thereon. Notice of the petition must be posted on the outside of the premises for a stated time. Remonstrants may file objections within ten days from the posting, and not after. A record is to be kept of remonstrances. It does not appear that the plaintiff company filed any remonstrance within the time allowed. Its letter of protest would appear to have been sent too late to come within the regulation, and it appears to have been ignored. The plaintiff was therefore not a party to the proceeding before the board.

Upon this state of facts the defendants insist that, at the time the bill was filed, the plaintiff had a plain, adequate, and complete remedy at law; *viz.,* certiorari.

Assuming without deciding that the petitions, with the board's favorable action thereon, unaccompanied by any notice to the assessor to issue the license, constituted a record sufficiently complete to allow of its being brought up on certiorari at the time the bill was filed, the question remains whether one who was not a party to the proceeding, and was interested therein only indirectly and consequentially, stood in such a relation thereto that he had an unquestionable right to the writ. We certainly should be loath to dismiss a bill, after full equity in all other respects had been shown, unless it admitted of no doubt that the plaintiff had forsaken a remedy at law that was plain, adequate, and complete.

Whether the plaintiff would have been entitled to a writ of certiorari is a question upon which the different courts have spoken differently. In New Jersey it appears from *Hopper* v. *Morgan,* — N. J. Eq. —, 42 Atl. 171, that where a license to sell intoxicating liquors has been granted by a municipal board contrary to law, such action may be reviewed on certiorari at the instance of a citizen and taxpayer, but only in the discretion of the court. Even there it is not a matter of absolute right.

So, in Rhode Island (*Dexter* v. *Cumberland,* 17 R. I. 222, 21 Atl. 347), it is held that an adjoining owner has such an interest that he may have certiorari to determine whether the license has been legally granted.

But in an instructive early case in Maine (*Bath Bridge & Turnp. Co.* v. *Magoun,* 8 Me. 292), it was held that only a party to the record, or one who has a direct or immediate interest in it, or is privy thereto, can have the writ. That was a case where the court of sessions had located a highway without complying with the conditions prescribed by statute, to the indirect and consequential injury of the plaintiff, a turnpike company, which was not a party to the record. The court said it had no doubt that the road would be essentially prejudicial to the plaintiff, but that such indirect interest did not entitle it to

the writ, any more than it would entitle a hotel whose patronage would be injuriously affected by the establishment of the new road.

In *Starkweather* v. *Seeley,* 45 Barb. 164, it was held that one who had been dispossessed by the sheriff in summary proceedings to recover possession of land, but who was not a party to the proceedings, although he would have a right to be made a party on application, was not entitled to certiorari, it being held that the true test was whether the person seeking to review was a party in form or substance.

In Mississippi it was held that none but parties to the record sought to be reviewed was entitled to the writ, and that this did not include one who was merely a qualified voter of the municipality. *McCreery* v. *O'Flinn,* 63 Miss. 204. And in another case in the same volume (*McCreary* v. *Rhodes,* p. 308), it was held that a qualified voter who had appeared before the municipal authorities in opposition to the petition for license had become so connected with the proceedings as to entitle him to the writ.

In *Stuart* v. *Hall,* 2 Overt. 179, the question arose whether certiorari would lie in a case where the petitioner had previously brought a bill in equity looking to the same relief, and the same was still pending or had been dismissed without the consent of the court of equity; and it was held that certiorari would not lie, especially inasmuch as in equity "the case may be more extensively viewed and the party have every redress which, consistently with equity, he ought to have." In the headnote to the report of this case it is stated that the decision was overruled in *Studdurt* v. *Fowlkes,* 2 Swan, 539, but an examination of the latter case will show that *Stuart* v. *Hall* was overruled, not upon the point above stated, but upon a point of practice as to the use of affidavits.

Among all the cases we have found these appear to be the nearest in point.

We think, therefore, that it can hardly be said that the plaintiff was clearly entitled as a matter of absolute right to a writ of certiorari at the time when this bill was brought, especially as

that had never been held in this jurisdiction, and that the bill ought not to be dismissed upon that ground.

IV. Finally it is said that the plaintiff had a plain, adequate, and complete remedy at law by way of a prosecution in the criminal courts against Carr and Wardell for maintaining saloons in territories where licenses could not legally be granted, assuming of course that the plaintiff is right in its contention that licenses could not legally be granted west of Thirty-fifth street.

Paragraph 18 of the section in hand declares that prosecutions for violations of its provisions shall be "on information filed in the police court by the corporation counsel of the District of Columbia." As the corporation counsel had advised the granting of the licenses and still maintains that they were legally granted, it is hardly to be supposed that he would consider it his duty to prosecute the grantees upon the theory that the licenses were granted contrary to law.

Moreover, one whose property is being specially injured, and threatened with further special injury, by a nuisance, is not bound to rely upon a prosecution in the criminal courts, even though the nuisance may also partake of a public character and so be a proper subject for criminal prosecution. The fact that an act may be a crime does not prevent its being at the same time a tort, and does not prevent its author from being liable therefor to the injured party. 15 Am. & Eng. Enc. Law, 197; *Re Debs,* 158 U. S. 564–593, 39 L. ed. 1092–1105, 15 Sup. Ct. Rep. 900.

No error being found in the record, the decree is

*Affirmed.*